## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARIC D. HAUSKNECHT, COMPLETE MEDICAL CARE SERVICES OF NY, PC AND COMPLETE MEDICAL CARE SERVICES OF NY, PC HEALTH AND WELFARE BENEFIT PLAN,<br>　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>JOHN HANCOCK LIFE INSURANCE COMPANY OF NEW YORK,<br>　　　　　　　Defendant. | CIVIL ACTION<br><br><br><br>NO.  17-3911 |

## MEMORANDUM OPINION

After the Department of Labor sued John Koresko for converting the assets of welfare benefit plans, *see Perez v. Koresko*, 86 F. Supp.3d 293 (E.D. Pa. 2015), *aff'd*, 646 F. App'x 230 (3d Cir. 2016) ("the Department of Labor lawsuit"), some of those plans and individual participants in the plans brought lawsuits against third parties to recover lost money.  This is one such lawsuit.  Plaintiffs allege that Defendant John Hancock Life Insurance Company of New York ("John Hancock"): (1) breached its fiduciary duties in violation of Section 1132(a)(2) and 1132(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2)-(3); (2) violated Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); and (3) conspired to violate RICO in violation of Section 1962(d) of RICO, 18 U.S.C. § 1962(d).

Pending now are Defendant's motion to dismiss and Plaintiffs' motion for partial summary judgment.  In its motion to dismiss, Defendant argues that Plaintiffs' ERISA claims must be dismissed because it is not an ERISA fiduciary.  It further argues that Plaintiffs' RICO claims must be dismissed for lack of standing and, alternatively, because the Complaint contains

insufficient facts to support such claims. Plaintiffs, in turn, argue for summary judgment on their ERISA claims (but not their RICO claims). Plaintiffs and Defendant each attach various documents to their motions.

For the reasons that follow, Defendant's Motion shall be granted in part and denied in part, and Plaintiffs' Motion shall be denied.

## I. FACTS

Between 2002 and 2013, John Koresko and his affiliates operated a multiple employer welfare arrangement that purportedly allowed employers to purchase cash value life insurance policies and take a tax deduction for the premiums as a business expense. In fact, Koresko systematically converted and misused the assets, which were held in trusts, of the welfare benefit plans that participated in the arrangement. The arrangement is comprehensively explained in the Department of Labor lawsuit opinion referenced *supra*. Given the familiarity of the parties with that lawsuit, the Court will not describe the full extent of the arrangement here.

To take advantage of the arrangement, a prospective participating employer signed an adoption agreement which established the employer's own welfare benefit plan, adopted a prototype provided to them by Koresko *et al*., and agreed to the terms of a pre-existing trust. Life insurance policies were taken on the lives of plan participants although the Trustee was named as the owner and beneficiary. Those policies were owned by the Trusts for the benefit of the welfare benefit plans. The Trust functioned as a pass through vehicle, receiving insurance premiums paid by the employer and paying them to the insurance company for the policies.

Koresko's defalcations were effected by, *inter alia*, unauthorized and improper loans taken out against the cash value accumulated in life insurance policies.

Plaintiffs here were among those whose policy was stripped, in part, of its cash value by Koresko. Plaintiff Complete Medical Care Services of NY, PC, Health and Welfare Benefit Plan

("the Plan") is one of the employee benefit plans that participated in the arrangement. Plaintiff Complete Medical Care Services of NY, PC ("CMCS") is the sponsoring employer of the Plan. And Plaintiff Aric D. Hausknecht is a participant of the Plan whose life was insured pursuant to a policy issued by Defendant.[1]

Plaintiffs became aware of the Koresko arrangement through a financial advisor and decided to participate. Pursuant to the Plan, an application for life insurance was submitted to insure the life of Hausknecht. The owner of the Policy was listed on the Application as the "REAL VEBA Trust/ FBO" the Plan, with the Trust providing a King of Prussia address "c/o/ Penn-Mont Benefit Services, Inc." The Policy explicitly provided that ownership could be changed by written request. Defendant[2] then issued the Policy with a death benefit of $6 million. Over the next twelve years, CMCS contributed $865,000 to pay premiums on the Policy.

In spring 2002, the insurer received from Penn-Mont, the Plan Administrator, a letter of resignation from the Trustee of the REAL VEBA Trust and a Verification wherein Community Trust Company ("CTC") was appointed Trustee of the REAL VEBA. The Verification stated that:

---

[1] The facts are taken from the Complaint and various documents John Hancock attaches to its motion to dismiss including – the application for the life insurance policy ("the Application"); the life insurance policy ("the Policy"); a letter of resignation from the Trustee of the REAL VEBA Trust; a Verification of Trust and Warrant of Authority ("Verification") appointing Community Trust Company ("CTC") as the Trustee of the REAL VEBA Trust; a request by the Plan Administrator, Penn-Mont Benefit Services, Inc., to change the owner of the Policy from the REAL VEBA Trust to Complete Medical Care Services of NY, PC, Health and Welfare Benefit Plan of NY P.C.; and a "Partial Withdrawals/Loans Form." Plaintiffs have not objected to the consideration of these documents on the motion to dismiss. Furthermore, although on a motion to dismiss it is generally improper to consider extraneous documents, here each of those documents is referred and integral to Plaintiffs' claims and, thus, will be considered. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss may be considered if the plaintiff's claims are based on the document). Defendant has also attached various other documents, including a Disclosure Agreement, purporting to illustrate the replacement of CTC as Trustee by Penn Public Trust, the sole director of which was John Koresko. The progeny of these documents is disputed, and thus they shall not be considered on this motion to dismiss.

[2] The Application was made to Manufacturer's Life Insurance Company of New York. In 2005, Manulife's name changed to John Hancock NY as a result of a merger with John Hancock USA.

The trust empowers the trustee to exercise any and all rights associated with owning life insurance policies and the trustee can exercise these rights without the consent of the insured. These rights include but are not limited to . . . borrowing against the policy . . . and changing the beneficiary.

The Verification also designated Jeanne Bonney as the "Appointed Signator" with authority to sign documents on behalf of the new Trustee, CTC. John Koresko's name was not included anywhere on the document. On November 24, 2005, the Defendant received a letter, on Penn-Mont letterhead, from Bonney as signatory for CTC, directing that the name of the owner and the beneficiary be changed from the REAL VEBA Trust to the "Complete Medical Care Service of NY, P.C. Welfare Plan Trust." Pursuant to this directive and in accordance with the Verification, Defendant did as instructed.

The Complaint alleges that in October 2009, John Hancock loaned "Koresko *et al.*" $405,892.44, collateralized by the cash value that had accumulated in the Policy. Plaintiff seeks, *inter alia,* restitution of this amount as well as all profits that the Plan would have earned on the funds had John Hancock not made the loan.

## II.   LEGAL STANDARD

In analyzing a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must first, outline the elements of the claim, second, remove legal conclusions from the complaint, and third, look for and assume as true the well-pled factual allegations in the complaint. *See Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). To survive a motion to dismiss, the complaint must have enough factual matter that "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Context matters in notice pleading," so "some complaints will require at least some factual allegations to make out a 'showing that the pleader is entitled to relief, in order to give the defendant fair notice of what

the . . . claim is and the grounds upon which it rests.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## III.   ANALYSIS

### A.  Section 1132(a)(2) Claim

#### i.   Defendant's Motion to Dismiss

Whether Defendant is an ERISA fiduciary is dispositive of Plaintiffs' Section 1132(a)(2) ERISA claim as that section allows plaintiffs to obtain equitable relief and to recover damages only from fiduciaries who breach their duties. *McLemore v. Regions Bank*, 682 F.3d 414, 422 (6th Cir. 2012). ERISA fiduciaries are "personally liable to make good to such plan any losses to the plan resulting from . . . breach" of any duties imposed by ERISA. *See* 29 U.S.C. § 1109; 29 U.S.C. § 1132(a)(2). Accordingly, if Plaintiffs have not sufficiently alleged that Defendant is a fiduciary, their Section 1132(a)(2) claim must fail.

As a preliminary matter, the Complaint does not allege that Defendant was named a fiduciary in any of the plan documents. 29 U.S.C. § 1102(a)(2) (defining a "named fiduciary" as a "fiduciary who is named in the plan instrument"); *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 291 (3d Cir. 2014) ("ERISA provides that a person is a fiduciary to a plan if the plan identifies them as such."); *Marks v. Independence Blue Cross*, 71 F. Supp.2d 432, 434 (E.D. Pa. 1999) ("[Defendant] is not a named fiduciary."). It does, however, allege that Defendant is a fiduciary of the plan "in that it possesses and exercises control over assets of the [Plan] including, but not limited to, the cash value of the insurance policy insuring the life of [Plan] participant Aric Hausknecht."

Section 1002(21)(A) of ERISA, as relevant here, provides that a person is a fiduciary "with respect to a plan to the extent [he] exercises any authority or control respecting management or disposition of its assets." *See* 29 U.S.C. § 1002(21)(A); *Santomenno*, 768 F.3d

at 293 (the issue is whether Defendant exercised "any authority or control over the management or disposition of *plan assets*.") (emphasis in original).  Furthermore, an entity is only a fiduciary to the extent it exercises "*undirected* authority or control" over plan assets.  *See Srein v. Frankford Trust Co.*, 323 F.3d 214, 221-22 (3d Cir. 2003) (emphasis added).

Plaintiffs contend that the Hausknecht Policy, its cash value and the ability to borrow against the cash value are plan assets.  In support of that proposition, they cite to *Department of Labor v. Koresko*, in which the Third Circuit noted that "the individual employer-level employee benefit plans have a beneficial interest in the trust and therefore the assets of the trusts are 'plan assets' within the meaning of ERISA."  646 F. App'x 230, 236-40 (3d Cir. 2016).

Accepting that the assets of the trusts are "plan assets" still leaves open the question of whether John Hancock, as the issuer of the Hausknecht Policy, "exercised[d] any authority or control" over those assets.  The Complaint alleges that John Hancock had and exercised control over the cash value of the Policy by permitting Koresko to change the owners and beneficiaries of the Policy; by disbursing loans secured by the cash value of the Policy; and, by concealing the conversion from plan participants and plan fiduciaries.[3]

As noted, an entity is a fiduciary only if it exercises "undirected authority or control" over plan assets.  *See Srein*, 323 F.3d at 221-22.  But mere custody of assets does not constitute such authority or control.  *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 347 (3d Cir. 2004) ("[C]ustody or possession over plan assets, without more, does not render one a fiduciary.") [hereinafter, "*Mushroom*"].  In *Mushroom*, a bankruptcy debtor sought to hold a law firm and a

---

[3] Although the Complaint alleges that Defendant's failure to give Plaintiff Hausknecht information is an exercise of authority or control over plan assets, that theory is not directly addressed in either party's briefs.  Thus, the fiduciary claim will not be dismissed to the extent it is premised on that theory.  For the same reasons, summary judgment will be denied to Plaintiffs on that theory.

bank liable because the law firm's partner embezzled the debtor's funds held by the bank.

Looking to ERISA's fiduciary provision, 29 U.S.C. § 1002(21)(A)(i), the Third Circuit found

that "ERISA does *not* consider as a fiduciary an entity such as a bank when it does no more than

receive deposits . . . on which the fund can draw checks." *See Mushroom*, 382 F.3d at 346-47.

Thus, given that the bank did nothing more than "serve as the holder of assets placed there," the

bank was not a fiduciary. *See id*. at 347. Similarly, the law firm had no "legal right or discretion

to dispose of [the] escrowed funds." *Id*. Instead the firm was to pay the funds to the bankruptcy

trustee on demand and was merely "to hold [the funds] in escrow for the benefit of the [debtor's]

estate." *Id*. Thus, because the law firm was merely a "holder of . . . escrowed funds," it was not

a fiduciary. *See id*.

     Here, Plaintiffs contend that by complying with a Koresko associate's demand to change

the owners and beneficiaries of the Policy, Defendant exercised control over that Policy.

However, the allegations in the Complaint, as informed by the documents Defendant

appropriately attached to its motion to dismiss, fail to plausibly show that John Hancock

exercised undirected control with respect to the change in owner and beneficiary from the REAL

VEBA Trust to the "Complete Medical Care Service of NY, P.C. Welfare Plan Trust" in 2005.

Specifically, the Policy itself allowed the owner to assign it and change the beneficiary

designation. Here, the owner of the Policy was the Trustee, which held the Policy for the benefit

of the welfare benefit plans. In accordance with the Trustee-owner's authority to assign the

Policy and change the beneficiary, Defendant received a written request that it do so.

Specifically, that request came from Jeanne Bonney, who the Trustee-owner had identified in its

"Verification" as an "Appointed Signator" on its behalf. Bonney's request came on "Penn-Mont

Benefit Services, Inc." letterhead, which was the entity that functioned as the Plan Administrator.

Defendant then complied, according to the Complaint, with Bonney's request.

These facts suggest nothing other than Defendant's compliance with its duties. The request itself came from an "Appointed Signator" of the Trustee-owner. Much like the law firm in *Mushroom* that had to pay the escrowed funds to a trustee on demand, *see id*. at 346-47, Defendant here also had to comply, pursuant to the contract it had with the owner of the Policy, with a request from the owner to assign the Policy or change the beneficiary. In doing so, Defendant cannot be said to have exercised undirected authority or control over the Policy, as it followed the directions of the Trustee: First, it understood Jeanne Bonney had the authority to make requests as an "Appointed Signator," and second, it complied with a request from Bonney. At least with respect to the change in ownership from REAL VEBA to the Complete Medical Care Service of NY, P.C. Welfare Plan Trust, Defendant did nothing more than it was directed to do.[4]

That Defendant is not a fiduciary with respect to this change in ownership does not, however, foreclose that it is a fiduciary with respect to the issuance of the loan. *See Srein*, 323 F.3d at 221 (stating that because fiduciary status "is not an all or nothing concept[,] [a] court must ask whether a person is a fiduciary with respect to the particular activity in question."). For example, in *Srein*, a plaintiff sought to hold a trustee bank liable for failing to pay out money due under his investments in viatical settlement contracts. The Third Circuit accepted the lower court's conclusion that defendant was not a fiduciary with respect to the initial decision to invest in the viatical contracts for which, "[u]nder the Plan Documents, [defendant] was not to exercise any investment discretion or provide any investment advice whatsoever." *See Srein v. Frankford*

---

[4] Plaintiffs do allege that: "The Verifications were knowingly false and John Hancock knew they were invalid." However, this assertion finds no factual support in the allegations of the Complaint.

*Trust Co.*, 2001 WL 849524 at *4 (E.D. Pa. 2001), *rev'd on other grounds*, 323 F.3d 214 (3d Cir. 2003).  However, the Court went on to analyze other acts undertaken by the defendant.

Specifically, with respect to certain other acts, the Third Circuit found the *Srein* defendant had exercised control and authority over plan assets.  The *Srein* plaintiff's investments were unregistered, and as such, the defendant trustee kept those investments in its vault with a randomly assigned number.  But, the defendant trustee inadvertently allowed a third-party to invest in the same contract, and when the benefits became due, the defendant paid the third-party.  The Third Circuit found the defendant trustee exercised "undirected authority or control" because the plaintiff "did not direct the placement of the several agreements in the . . . vault without cross-referencing one to the other," and the plaintiff did not direct the distribution of the proceeds to the third-party.  *See id*. at 221.

Under this analytical framework, Plaintiffs have adequately pled the second basis they offer for considering Defendant a fiduciary here: that Defendant, by providing a loan to John Koresko against the cash value of the Policy, exercised control over plan assets, to wit, the cash value of the Policy.  Like the change in ownership, the Policy required Defendant to issue a loan to the owner of the Policy when requested to do so.  However, the loan request here, based on the allegations in the Complaint and the documents annexed to the motion to dismiss, did not come from the owner.  Instead, the loan request came from Koresko, who signed the application as "Director – Trustee."  Although Koresko *et al*. provided Defendant a document entitled "Custodial Agreement," which purportedly designated John Koresko's law firm as CTC's agent and gave the firm possession of the policies, the Complaint plausibly states that the Custodial Agreement was invalid, but that Defendant nevertheless treated it as valid.  Based on the Complaint and the documents, nothing CTC (the actual owner) did permitted Defendant to treat

Koresko as the owner of the Policy, quite unlike CTC's representations about Jeanne Bonney. And, unlike a bank which merely lets an account holder withdraw funds, Defendant's actions, which treated Koresko as an owner of the Policy, are more analogous to a bank permitting a random person to withdraw funds. *Id.* (finding defendant was in control of the funds when it erroneously distributed them to the wrong customer).

Thus, Plaintiffs' Section 1132(a)(2) claim shall be dismissed to the extent it seeks to hold Defendant liable as a fiduciary premised on the theory that Defendant exercised authority or control by changing the owner and beneficiary of the Policy.

### ii. Plaintiffs' Motion for Summary Judgment

A different legal standard applies to Plaintiffs' summary judgment motion on its ERISA claim. Summary judgment must be granted to a moving party if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). Material facts are determined by reference to the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute "exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See U.S. ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 93 (3d Cir. 2018).

In their motion for partial summary judgment on the ERISA claims, Plaintiffs argue that documents they attach to their motion show that Defendant was a fiduciary for the purposes of Section 1132(a)(2). However, those documents – which include the Plan document, the REAL VEBA trust document and the Adoption Agreement – show, to the contrary, that the parties did not anticipate that Defendant would be a fiduciary with respect to the Policy. Specifically, Defendant is not listed as a fiduciary under the Plan document, the REAL VEBA Trust, or the Adoption Agreement, and other terms of those documents show that the insurer's role was

limited.[5]

Under the Plan document, Penn-Mont, the Plan administrator, had the "sole discretion to delegate any and all Fiduciary responsibilities under the [REAL VEBA] Trust (other than those of the Trustee) to designated persons." Furthermore, any delegation of fiduciary responsibility by Penn-Mont had to be "communicated in writing to the Employer, the Plan Administrator, the Trustee, the Insurer, and each Participant and Beneficiary." The documents provided by Plaintiffs do not include any such communication.

The Plan document also includes specific provisions regarding insurers. It provides that, no insurer that issues a policy for the purpose of the plan, as Defendant did here, shall be required to "look into the terms of this Plan or question any action as authorized by the Trustee in the application for the policy or changes in the existing policy." It states further that "[t]he insurer shall not be deemed to be a party to this Plan and its sole obligations shall be measured and determined solely by the terms of its Contract and other agreements executed by it." Additionally, it requires that documents both signed by the Trustee and provided to an insurer that issues a policy for the purpose of the Plan "shall be accepted by the insurer as conclusive evidence of any matters mentioned in the Plan and Trust, and any such insurer shall be fully protected in taking any action of the faith hereof and shall incur no liability or responsibility for doing so." These documents alone subvert a conclusion that Defendant was a fiduciary for all purposes with respect to the Policy.

Given this factual dispute, Plaintiffs' motion for partial summary judgment on their

---

[5] Plaintiffs also suggest that John Hancock is a fiduciary because its rules were incorporated into the Plan and John Hancock determined how and in what amount death benefits would be paid. However, Plaintiffs only raised this contention in their Reply brief in support of their summary judgment motion. Thus, Plaintiffs waived that argument. *See Laborers Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief").

Section 1132(a)(2) claim shall be denied.

**B. Section 1132(a)(3) Claim**

Section 1132(a)(3) of ERISA authorizes claims for equitable relief.[6]  Defendant's motion

to dismiss asserts that: (1) Plaintiffs have failed to adequately state a Section 1132(a)(3) claim;

and, (2) Section 1132(a)(3) does not authorize the relief that Plaintiffs seek.  Neither reason

warrants dismissal of Plaintiffs' Section 1132(a)(3) claim in its entirety.[7]

       i.   <u>Elements of Claim</u>

First, Plaintiffs' Complaint adequately states a claim under Section 1132(a)(3), which

"authorize[s] suits against any other person who knowingly participates in a fiduciary's

violations of her duties."  *See National Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 90 (3d Cir. 2012)

(internal citations and alterations omitted).  Specifically, Plaintiffs have adequately pled facts

that plausibly support the conclusion that Defendant (1) knowingly participated (2) in a

fiduciary's violation of duty (a breach).

With respect to the second element, this Court and the Third Circuit have already

concluded that John Koresko was a fiduciary who violated his fiduciary duty when he absconded

with plan assets, including the money he received from insurers as loans.  *See Perez v. Koresko*,

86 F. Supp.3d at 386 (concluding that Koresko violated Section 406(b)(1), which prohibits

---

[6] Specifically, Section 1132(a)(3) permits a civil action to be brought "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).

[7] The issue of whether the relief requested is authorized by statute is appropriate to resolve on a motion to dismiss. *See, e.g.*, *Central States, Se. & Sw. Areas Health & Welfare Fund v. Bollinger, Inc.*, 573 F. App'x 197 (3d Cir. 2014) (affirming grant of motion to dismiss because relief sought in Section 1132(a)(3) action was not equitable).

transactions between a plan and a fiduciary of the plan).[8]

As to the element of knowing participation, Plaintiffs have also satisfied their pleading burden. Plaintiffs alleged that Defendant "made the loans despite having actual and constructive knowledge that . . . the loans served no purpose that could possibly benefit either class of stakeholders." In fact, as noted in the analysis above, Plaintiffs' Complaint contains sufficient factual matter to support the proposition that Defendant knew or should have known that Koresko lacked the authority to request the loans. Although Defendant argues that it did not participate in a "prohibited transaction" when it issued the loan, its argument assumes that it was entitled to issue, and Koresko was entitled to receive, the loan in the first instance. Plaintiffs' Complaint, however, contains sufficient facts alleging otherwise.[9]

### ii. Relief Sought

Nevertheless, Defendant contends that Section 1132(a)(3) is not available to Plaintiffs because the remedies they seek are not equitable. Those remedies are: (1) "restitution of all losses stemming from the conversion of the cash value of the insurance policy"; (2) "disgorg[ment] or . . . restitution of all fees, commissions or any other form of compensation paid or profits made in violation of Section 406"; and (3) "full restitution of all profits that the [Plaintiffs' Plan] would have earned on the converted funds."

The "equitable relief" available under Section 1132(a)(3) is cabined to "those categories

---

[8] Defendant here suggests that *Renfro v. Unisys Corp.*, 671 F.3d 314, 325 (3d Cir. 2011), forecloses a suit against a nonfiduciary "charged solely with participating in a fiduciary breach." However, *Renfro* was later limited in its holding by the Third Circuit. *See Nat'l Sec. Sys., Inc.*, 700 F.3d at 92. In fact, that later case dealt with a nonfiduciary's participation in a fiduciary's violation of Section 406(b) of ERISA, which is precisely the Section, as this Court and the Third Circuit found, Koresko violated. Thus, *National Security Systems, Inc.*, controls here.

[9] Moreover, the Eighth Circuit case Defendant cites is inapposite. Defendant asserts that case found "John Hancock had no duty to ensure that loan proceeds taken against a life insurance policy reached the correct recipient." *See Torti v. Hoag*, 868 F.3d 666, 673 (8th Cir. 2017). *Torti*, however, dealt solely with Arkansas contract and tort law and not ERISA.

of relief that were *typically* available in equity during the days of the divided bench." *See*

*Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 657

(2016) (emphasis in original). Whether a plaintiff's requested relief is legal or equitable

"depends on [1] the basis of [the plaintiff's] claim and [2] the nature of the underlying remedies

sought." *Id*. The Supreme Court prescribes a basic "framework for resolving this inquiry. To

determine how to characterize the basis of a plaintiff's claim and the nature of the remedies

sought, we turn to standard treatises on equity, which establish the 'basic contours' of what

equitable relief was typically available in premerger equity courts." *Id*.

 The usual distinction between an equitable and legal remedy is whether the recovery

sought is against "some specific thing . . . rather than . . . a sum of money generally." *Id*.

Typically, plaintiffs "could seek restitution in equity . . . where money or property identified as

belonging in good conscience to the plaintiff could *clearly be traced* to particular funds or

property in the defendant's possession." *See Great-West Life & Annuity Ins. Co. v. Knudson*,

534 U.S. 204, 210, 213 (2002) (emphasis added) [hereafter, "*Great-West*"]; *see also Montanile*,

136 S. Ct. at 658-59 ("Equitable remedies are . . . directed against some specific thing . . . rather

than a right to recover a sum of money generally out of the defendant's assets."). If that property

was traceable, equity courts "could then order defendant to transfer title (in the case of a

constructive trust) or to give a security interest (in the case of an equitable lien) to a plaintiff who

was, in the eyes of equity, the true owner." *See Great-West*, 534 U.S. at 213.

 Two decisions by the Supreme Court illustrate the distinction between legal and equitable

remedies under ERISA. In *Great-West*, the Court decided that the plaintiff was seeking a legal

remedy rather than an equitable one. There, the plaintiff sought reimbursement for medical

expenses it paid on behalf of a participant. Specifically, the participant had obtained a settlement

with a third-party, and the plaintiff sought what it purported to be "restitution" of the medical expenses from that settlement. The Supreme Court first observed that simply attaching the label of "restitution" did not make the relief equitable. *Id*. at 212. Restitution was a legal remedy when the plaintiff "could not assert title or right to possession of particular property, but . . . [could] show just grounds for recovering money to pay for some benefit the defendant had received from him." *Id*. at 213. Restitution was equitable, however, where "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id*. Because in *Great-West* the defendant never had possession of the particular funds, the Court decided the remedy plaintiff sought was legal rather than equitable. *Id*. at 214.

Similarly, in the Supreme Court's decision in *Montanile*, a benefit plan sought reimbursement from one of its participants for medical expenses he incurred after being hit by a drunk driver. Seeking an "equitable lien," the benefit plan asserted it had a right to funds the participant had received in a settlement with the drunk driver. Before the benefit plan sued, however, the participant had spent those funds. Thus, the Supreme Court held that even when a defendant dissipates a specifically identified fund, the plaintiff pursuing a Section 1132(a)(3) remedy cannot obtain a judgment against the defendant's general assets "even though the defendant's conduct was wrongful." *See Montanile*, 136 S. Ct at 659.

In light of the above framework, Plaintiffs' requested relief for "restitution of all losses stemming from the conversion of the cash value of the insurance policy" is available under Section 1132(a)(3) to the extent Plaintiff seeks restitution of the Policy value. In fact, Plaintiffs have satisfied exactly what the Supreme Court found lacking in *Montanile* and *Great-West*: specifically identified property in Defendant's possession. Plaintiffs here identified a specific

asset – the Defendant's rights to repayment of the loans it disbursed from the Policy – that yields a "specific block of money." *Cf. Sackman v. Teaneck Nursing Ctr.*, 86 F. App'x 483, 485 (3d Cir. 2003) (finding equitable relief inappropriate where plaintiff did not identify a "specific block of money"). Moreover, there is an equitable manner in which the relief requested could be obtained. *See, e.g.*, *Great-West*, 534 U.S. at 213-14 (constructive trust may be imposed where money or property "belonging in good conscience to the plaintiff could clearly be traced to particular . . . property in the defendant's possession."); *see also* Dan B. Dobbs & Caprice L. Roberts, LAW OF REMEDIES §4.3(2) (3d ed. 2018) ("The constructive trust might be imposed upon any identifiable kind of property or entitlement in defendant's hands if, in equity and conscience, it belongs to plaintiff.").

By contrast, Plaintiffs' claims for restitution of profits Plaintiff could have earned on the converted funds and disgorgement of fees, commissions, or compensation or profits earned under Section 1132(a)(3) fail. Nothing in Plaintiffs' Complaint suggests that the fees or commissions Defendant collected or the lost investment opportunities for Plaintiffs can be traced to specifically identifiable funds in Defendant's possession. *Great-West*, 534 U.S. at 214. Thus, those aspects of Plaintiffs' claims are not viable under Section 1132(a)(3).[10]

Thus, Plaintiffs' Section 1132(a)(3) claim will be dismissed except to the extent it seeks restitution of the Policy value.

### C. RICO Claims

Turning now to Defendant's motion to dismiss Plaintiffs' RICO claims, which are brought under Sections 1962(c) and 1962(d): Section 1962(c) makes it "unlawful for any person

---

[10] Moreover, Plaintiffs also appear to have dropped their claims for disgorgement and restitution of potentially lost profits, as the only argument they offer in their opposition briefing concerns the Policy benefits.

employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *See* 18 U.S.C. § 1962(c).  Section 1962(d) makes it unlawful to conspire to violate, among others, Section 1962(c).  *See* 18 U.S.C. § 1962(d).[11]

Defendant, however, contends that Plaintiffs cannot proceed on their RICO claims because Plaintiffs (1) lack RICO standing[12] and (2) they have failed to properly allege the elements of a RICO claim.  Each argument is addressed in turn.

   i. <u>RICO Standing</u>

RICO provides a private right of action to a person who is injured in his "business or property by reason of" a RICO violation.  *See* 18 U.S.C. § 1964.  In order to have standing to bring a RICO claim, a plaintiff must allege (1) that he suffered an injury to business or property and (2) that the injury was proximately caused by the defendant's racketeering activities.  *See In re Avandia Mktg., Sales Practice & Product Liab. Litig*., 804 F.3d 633, 638 (3d Cir. 2015); *see also Holmes v. Sec. Inv'r Prot. Corp*., 503 U.S. 258, 269 (1992).

The Individual and Employer Plaintiffs do not contravene Defendant's contention that they lack RICO standing and have, thus, waived the argument.  *See Laborers Int'l Union of N.*

---

[11] Defendant argues, and Plaintiffs do not rebut, that the RICO conspiracy count must be dismissed absent a substantive violation of RICO.  *See* 18 U.S.C. § 1962(d); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 373 n.72 (explaining that a consummated violation of Section 1962(c) need not be alleged but a plaintiff must allege injury from a racketeering act enumerated in Section 1961(1)).  Thus, the RICO conspiracy count of Plaintiffs' Complaint hinges on alleging an adequate RICO claim here.

[12] Defendant's arguments about "standing" generally are directed towards what is termed "RICO standing."  This is not to be confused with Article III standing, as standing under RICO is an inquiry not into the Court's power to adjudicate a dispute, but rather an inquiry into whether the Plaintiffs here have satisfied congressionally mandated requirements for bringing a lawsuit under RICO.  *See Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000) ("Apart from the Article III constitutional . . . standing requirements . . . plaintiffs seeking recovery under RICO must satisfy additional standing criteri[a] set forth in section 1964(c) of the statute.").

*Am., AFL-CIO*, 26 F.3d at 398.  The Plan Plaintiff does, however, maintain that it has RICO standing.  Thus, only the Plan Plaintiff's RICO standing is considered below.

### 1.    Injury to Business or Property

Defendant relies heavily on *Maio v. Aetna* for its argument that the Plan failed to sufficiently allege a RICO injury.  221 F.3d 472 (3d Cir. 2000).  However, *Maio* is distinguishable.  The *Maio* plaintiffs alleged that Aetna's internal policies devalued their healthcare plans by discouraging and inhibiting physicians from providing the quality of care promised.  *Id*. at 476-77.  The *Maio* plaintiffs explicitly disclaimed any inferior treatment or breach of contract with respect to the healthcare plans they bought.  *See id*. at 478-79.  Thus, their RICO claim was not cognizable because their injury was contingent on "the mere possibility that a physician *might* be influenced by [defendant's] policies to provide substandard medical care to" plaintiffs.  *Id*. at 494-95 (emphasis in original).

Here, however, the alleged injury to the Plan is not contingent on a future event.  Instead, the Complaint alleges at least one such event – making a loan to Koresko against the Policy – that has already occurred.  *See In re Avandia*, 804 F.3d at 640 (finding that plaintiffs' allegations were different in one "crucial" respect from *Maio* in that the injury was "not contingent on future events.").  This loan, which directly reduces the death benefit available to Plaintiffs, is a concrete financial loss, and accordingly, Plaintiffs have sufficiently alleged an injury to business or property.

Defendant also suggests that because the Trusts – and not the Plan – owned the Policy, the Plan could not have been injured in its "business or property."  *See* 18 U.S.C. §1964(c) (emphasis added).  Nevertheless, the Third Circuit has found that "a financial loss due to the diminution of the estate of which [plaintiff] is a beneficiary . . . . can serve as the basis for standing so long as the additional criterion of proximate causation is met."  *Schrager v. Aldana*,

542 F. App'x 101, 104 (3d Cir. 2013). Assuming, as the Complaint alleged, that the Trusts

owned the Policy for the benefit of the Plans and, thus, that the Plan is a beneficiary – a

proposition Defendants do not challenge – the Plan has alleged an injury to its business or

property for which it may sue if it also satisfies the requirement of proximate cause.

<em>2. Proximate Cause</em>

Proximate cause, demands "some direct relation between the injury asserted and the

injurious conduct alleged." *In re Avandia*, 804 F.3d at 642 (citing *Holmes*, 503 U.S. at 268-69).

The question, thus, is not simply whether Plaintiffs would not have been injured "but for" the

alleged RICO violation, but whether Defendant proximately caused Plaintiffs' injuries. *Holmes*,

503 U.S. at 268. Defendant contends that because the Trusts and Plan are distinct legal entities,

the injury to the Plan was indirect, occurring only because the Trust was first injured.

Three factors animate the proximate cause analysis. *See In re Avandia*, 804 F.3d at 642-

44. Those three factors are: [1] "the directness of the injury"; [2] "the risk of multiple

recoveries;" and, [3] "the likelihood of vindication by others."[13] *Id.*; *see also Bridge v. Phoenix

Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (finding proximate cause where "there are no

independent factors that account for [plaintiffs'] injury, there is no risk of duplicative recoveries

by plaintiffs removed at different levels of injury from the violation, and no more immediate

victim is better situated to sue.").

Defendant argues that the Plan Plaintiff lacks standing because any injury was to the

---

[13] In explaining the rationale behind the first factor, the Third Circuit noted that "indirect injuries make it difficult to ascertain the amount of a plaintiff's damages attributable to the violation" compared to other independent factors. *In re Avandia*, 804 F.3d at 642. With respect to the second factor, the Court noted "indirect injuries may present such a risk and courts would have to adopt complicated rules apportioning damages to guard against this risk." *Id.* And finally, the last factor, according to the Third Circuit, may obviate "the need to grapple with the problems presented by indirect claims . . . since directly injured victims can generally be counted on to vindicate the law as private attorneys general." *Id.*

Trust that owned the Policy and not to the Plan. Yet there is direct line between the injury to the Trust and the injury to the Plan. Regardless of which party in the chain – the Trust, the Plan or the Policy – was initially harmed, it was foreseeable that the loan would result in a diminution of the cash value of the Policy, which would inflict the same financial harm across the board. The presence of the Trusts does not sever the causal link between the injury to the Policy and the Plan. *See also In re Avandia*, 804 F.3d at 645 (finding presence of intermediaries did not sever the causal link because the plaintiffs were the "primary and intended victims of the scheme to defraud and their injury was a foreseeable and natural consequence of the scheme."). It was "a foreseeable and natural consequence of [defendants'] scheme" that an injury to the Policy would injure the Plan. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008).

The second factor also weighs in favor of finding proximate cause, as the risk of multiple recoveries if the Plan is allowed to sue is slight. *Bridge*, 553 U.S. at 658. Here, only the Plan Plaintiff maintains a RICO claim, and no other party is positioned to do so, thus making the risk of multiple, overlapping recoveries remote. Indeed, it is unlikely that any other plaintiff could sue Defendant for the financial loss to the Policy because, as alleged in the Complaint, the Policy only pays this particular Plan.[14]

Finally, under the third factor, there is no more direct or immediate victim that could be expected to sue. *Bridge*, 553 U.S. at 658. Specifically, while one might normally expect a Trustee to sue on behalf of a Trust, *see Struble v. N.J. Brewery Emps. Welfare Trust Fund*, 732 F.2d 325, 336-37 (3d Cir. 1984), *overruled on other grounds by Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Plan assets here are currently held and maintained by a court-

---

[14] Defendant suggests in its Reply brief that the Department of Labor already sued and recovered against Koresko. However, that case brought ERISA statutory claims for breach of fiduciary duty. Here, the claim is Defendant violated RICO.

appointed Independent Fiduciary. The Independent Fiduciary has limited powers – which do not include the authority to bring suit – pursuant to this Court's prior orders. Further, Defendant has not identified any other direct or immediate victim that could bring suit.

In *Anderson v. Ayling*, the Third Circuit set forth additional factors to consider in determining whether proximate cause exists: "the specific intent of defendant to harm plaintiff; . . . the nature of plaintiff's alleged injury; [and] . . . whether the damages claim is . . . highly speculative." *Anderson v. Ayling,* 396 F.3d 265, 270 (3d Cir. 2005) (internal citations omitted). Analysis of these factors does not change the result – that the Plan has standing to bring a RICO claim.

The consideration of the specific intent of the defendant to harm the plaintiff has its genesis in the antitrust context. *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 922-24 (3d Cir. 1999) (cited by *Anderson*; noting "the specific intent of defendant to harm plaintiff" as part of the antitrust proximate cause analysis) [hereinafter, "*Steamfitters*"]. In that context, if a defendant specifically intends to cause the plaintiff harm, it may be sufficient to establish that defendant's actions proximately caused plaintiff's harm. *See, e.g.*, *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537 (1983) ("The factors that favor judicial recognition of the [plaintiff's] antitrust claim [include] . . . that the defendants intended to cause that harm."). Although there is no clear precedential statement as to what constitutes "specific intent" in the RICO context, in the antitrust context it has been equated with "improper motive." *See, e.g.*, *Associated Gen. Contractors of Cal.*, 459 U.S at 537; *Steamfitters*, 171 F.3d at 925 (citing *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 964 n.13 (3d Cir. 1983)). Applying that concept of improper motive to the Complaint here, it alleges sufficient facts from which to infer that

Defendant had an improper motive to harm the Plan. Specifically, Plaintiffs alleged that Koresko requested a loan, and Defendant, without justification, made the loan and disbursed the funds; that Defendant was "on notice that Koresko *et al*. intended to ignore the governing plan documents" when it was provided with a purported "Custodial Agreement" that was invalid; that Defendant "made the loans despite having actual and constructive knowledge that the funds . . . served no purpose that could possibly benefit either class of stakeholders;" and, that Defendant knew that making the loan would ultimately reduce the policy and also knew that it would benefit from accruing interest on the loan. From these facts, specific intent, as in improper motive, to make a loan (the alleged RICO violation) and injure the Plan can be plausibly inferred.

The next factor concerning the nature of the injury is also sufficiently alleged in the Complaint. Financial loss is at the heart of RICO, and Plaintiffs allege it. *See Maio*, 221 F.3d at 483 ("[A] showing of injury requires proof of a concrete financial loss"). Specifically, the Plan Plaintiff seeks – at the very least – the difference in the Policy value before and after the loan as the damages they suffered.

And finally, the damages claim is neither speculative nor difficult to calculate here. In fact, the Plan knows the amount of the death benefit as well as the amount by which the loan and accruing interest reduced, and continue to reduce, that benefit. *Cf. Anderson*, 396 F.3d at 271 ("the damages claim is not speculative insofar as plaintiffs claim lost wages, but it would be difficult to determine to what extent plaintiffs' job loss was due to the alleged RICO acts").

In sum, the Plan Plaintiff here has alleged both an injury to its business or property and proximate cause. Thus, it has standing to bring a RICO claim.

ii.　Elements of a RICO Claim

Defendant argues that even if the Plan has RICO standing, it has not alleged sufficient

factual matter to plausibly state that Defendant violated the RICO statute.  Specifically, to state a

RICO claim, a plaintiff must allege the Defendant "(1) conduct[ed] (2) . . . an enterprise (3)

through a pattern (4) of racketeering activity."  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d

300, 362 (3d Cir. 2010) [hereinafter, "*Ins. Brokerage Antitrust Litig.*"].

Plaintiffs' theory of their RICO claims is as follows.  Plaintiffs allege that the entities

involved in Koresko's scheme, including Defendant, together formed an "Association-in-Fact"

enterprise; that Defendant participated in the scheme by marketing it, paying commissions, and

providing the insurance policies; and that Defendant embezzled monies seven times, committed

mail fraud by failing to provide Plaintiffs information when requested, and incurred liability

through principles of *respondeat superior*.  In RICO parlance, Plaintiffs allege that by these acts,

Defendant "conducted the affairs of the enterprise through a pattern of racketeering activity

including but not limited to numerous acts of conversion of assets of employee welfare benefit

plans, mail fraud, and wire fraud."

Defendant arguments that these allegations cannot support a RICO claim are that

Plaintiffs have insufficiently plead that Defendant conducted the affairs of an enterprise, that it

engaged in racketeering activity, and that the alleged predicate acts are tied together such as to

allege a RICO pattern.

Plaintiffs respond only selectively.  Specifically, they respond only that the Complaint

does properly alleged predicate acts and that Defendant is subject to liability under *respondeat*

*superior*.[15]  By failing to respond to a majority of Defendant's arguments, Plaintiffs have

conceded them, and thus, Plaintiffs' RICO claims will be dismissed.  *See, e.g.*, *Piccinetti v.*

*Clayton, Myrick, McClanahan & Coulter, PLLC*, 2017 WL 3879085 at *4 (D.N.J. Sept. 5, 2017)

(dismissing count for failure to respond and concluding plaintiff conceded the argument).

      An appropriate order follows.

**BY THE COURT:**


**/s/Wendy Beetlestone, J.**


_____

**WENDY BEETLESTONE, J.**

**Date: August 13, 2018**

---

[15] The Court questions whether *respondeat superior* is a viable theory of RICO liability.  The parties rely on one case that held that a RICO claim can be premised on both *respondeat superior* and aiding and abetting liability. *Petro-Tech, Inc. v. W. Co. of N. Am.*, 824 F.2d 1349 (3d Cir. 1987).  But, the Third Circuit later repudiated its reasoning with respect to aiding and abetting liability.  *Pa. Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839 (3d Cir. 2000) (relying on *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), which considered an analogous question with respect to securities law).  Because the reasoning the Third Circuit used to extend liability for both theories was analogous, this Court has doubts about the continuing validity of *Petro-Tech*.