**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ARIC D. HAUSKNECHT, COMPLETE MEDICAL CARE SERVICES OF NY, PC AND COMPLETE MEDICAL CARE SERVICES OF NY, PC HEALTH AND WELFARE BENEFIT PLAN,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| | **NO. 17-3911** |
| **v.** | |
| **JOHN HANCOCK LIFE INSURANCE COMPANY OF NEW YORK,** | |
| **Defendant.** | |

**O P I N I O N**

This lawsuit is one of many emanating from John Koresko's defalcation of nearly $40 million worth of assets belonging to welfare benefit plans. Plaintiffs Aric D. Hausknecht ("Hausknecht"), Complete Medical Care Services of NY, PC ("CMCS"), and Complete Medical Care Services of New York, PC Health and Welfare Benefit Plan ("CMCS Plan"), are some of Koresko's victims who are seeking to recoup from Defendant John Hancock Life Insurance Company of New York ("John Hancock") their lost money. Plaintiffs contend that Defendant's involvement in Koresko's scheme violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2)-(3), and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c)-(d).

This case, now in its fifth year of litigation, has progressed passed fact and expert discovery. The subject of this Opinion is Defendant's Motion to Exclude the reports and opinions of three of Plaintiffs' experts—Lance Wallach, Burke Christensen, and John Pund—on grounds that they are not qualified, and their opinions are neither relevant nor reliable within the meaning of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.

For the reasons that follow, Defendant's *Daubert* Motion shall be granted in part and denied in part.

## I.      BACKGROUND

Some background regarding Koresko's scheme is necessary to set the stage and understand the theories underlying this lawsuit, the expert reports at issue, and the Motion to exclude these reports. But, because this opinion is written primarily for the benefit of the Parties, and much of this story has been told in depth in other opinions,[1] only those facts and details necessary to understand the instant Motion are recited here.

Between 2002 to 2013, hundreds of employers decided to enroll in welfare benefit plans managed by Koresko. Koresko advertised that he had developed an arrangement that would allow employers to purchase life insurance policies for their employees and high value life insurance policies for executives (known as "cash value policies" or "ordinary life insurance") and deduct the premiums for both from their taxes through an exception in the Internal Revenue Code ("Code").

The Code generally imposes limits on the amount an employee can deduct for contributions to a welfare benefit fund. But multiple-employer welfare benefit plans can sometimes fall under an exception set forth in its Section 419A(f)(6), which exempts "any welfare benefit fund which is part of a 10 or more employer plan" from the restrictions on the deductions of contributions. I.R.C. § 419A(f)(6). Koresko advertised that his arrangement fell within this exception such that: (1) there were no limits on how much an employer could contribute; (2) all the contributions would not be taxed and could be deducted in federal taxes;

---

[1] *See Solis v. Koresko*, 884 F. Supp.2d 261 (E.D. Pa. 2012), *aff'd sub nom.*, *Sec'y of Labor v. Koresko*, 646 F. App'x 230 (3d Cir. 2016); *Perez v. Koresko*, 86 F. Supp.3d 293 (E.D. Pa. 2015), *aff'd sub nom.*, *Sec'y of Labor v. Koresko*, 646 F. App'x 230 (3d Cir. 2016).

(3) the contributions would accumulate interest—which would also not be taxed; and, (4) distributions from the policy would receive favorable tax treatment.  To use Koresko's own words, the arrangement was "one of the last, best, legal tax shelters available" and offered a way to "accumulate large benefits through tax-free build-up of capital."

Koresko ran his scheme through a "10 or more employer" multi-employer arrangement. In doing so, he created several entities: The "Regional Employers' Assurance League" ("REAL"), a "loose, unincorporated association of unrelated employers,"[2] through which he offered to employers his program of employee welfare benefits; two trusts which consolidated and held the assets of the individual employers' welfare benefit plans (the "Trusts"); over the years, three different entities, including an entity created and owned by Koresko, which served as trustees for the Trusts; and, PennMont Benefits, PC ("PennMont"), a corporation wholly owned by him and his brother, which served as the administrator of the multi-employer plan, and of each individual employer's plans.  PennMont marketed Koresko's arrangement, recruited participants and administered the individual plans, including the CMCS Plan.

To enroll in the arrangement Koresko required an employer to execute several agreements the terms of which bestowed enormous power on a Trust's trustee.[3]  The trustee purchased policies on the lives of the employees participating in the enrolled employer's plans. And, as relevant here, it had the power to assign any or all rights under the policies and was entitled to "any and all rights associated with owning life insurance policies," which it could exercise without the insured's consent.  These rights included surrendering the policy,

---

[2] *Solis*, 884 F. Supp.2d at 268.

[3] For more detail on these documents and their terms, *see, e.g.*, *Corman v. Nationwide Life Ins. Co.*, 396 F. Supp.3d 530, 538-39 (E.D. Pa. 2019); *Solis*, 884 F. Supp.2d at 268-71; *Perez*, 86 F. Supp.3d at 315-318.

withdrawing policy values, borrowing against the policy, transferring ownership, and changing the beneficiary.

Once enrolled in Koresko's multi-employer plan, employers, including Plaintiff CMCS, paid insurance premiums for these policies to one of the Trusts.  Koresko, through PennMont, took out life insurance policies on the lives of the employees who participated in the employer's plans, like Plaintiff Aric D. Hausknecht.  In this particular case, the policy issued from "ManuLife" (an entity which was later acquired by Defendant John Hancock) that had a death benefit of $6,000,000 (the "Hancock Policy").  In total, Plaintiffs contributed approximately $865,000 to pay for insurance premiums on the Hancock Policy during their enrollment in Koresko's multi-employer plan.

Over the course of eleven years, Koresko siphoned off much of the value of the life insurance policies by, for example, withdrawing the interest collected on the employer contributions, the benefits paid out upon the death of participants' employees, and the cash value of the policies.  He also took out loans exceeding $35 million from the insurance providers using the life insurance policies as collateral while several lawsuits, including one brought by the United States Secretary for the Department of Labor, were pending against him.[4]  In this case, Koresko took out a loan in the amount of $405,892.44 against the Hancock policy, which continues to accrue interest.  These loans further devalued the policies.

Adding insult to injury, it turned out that the Section 419A(f)(6) exception—the motivating reason to join Koresko's multi-employer arrangement—did not actually apply to it. The Internal Revenue Service ("IRS") determined that as a general matter, the Section 419A(f)(6) exception only applies to arrangements which operate as a single welfare benefit plan

---

[4] For a detailed history of Koresko's defalcations, *see Perez*, 86 F. Supp.3d at 299-372.

and that, specifically, Koresko's arrangement did not fit within the exception.  Ultimately, the IRS assessed penalties against Koresko and his affiliated entities for operating an unlawful tax shelter under the guise of a Section 419A(f)(6) plan.[5]

Koresko's scheme was eventually uncovered by the Department of Labor, which brought an enforcement action against him and his affiliates.  In the aftermath of Koresko's scheme, his victims filed suit against third-party entities, like Defendant John Hancock, whose involvement included issuing the insurance policies, permitting withdrawals or changes to the beneficiary or owner of the policies, and/or issuing loans against the policies' cash values.  Plaintiffs allege that these actions constitute violations of ERISA and RICO.  They assert that Defendant John Hancock knew of Koresko's multi-employer arrangement and its illegality under the tax laws, and knew that Koresko lacked the authority to make changes to the policies, withdraw funds or take out loans, but nonetheless took actions which furthered Koresko's scheme.  Plaintiffs contend that Defendant was motivated to participate in the scheme, despite knowing that it did not comply with the requirements for a Section 419A(f)(6) plan, because of what it stood to gain from the sale of its expensive, high value "ordinary life insurance" or "cash value" life insurance policies.  These policies were more profitable for Defendant than other types of life insurance policies but were less attractive to employers due to their higher costs.

## II.       STANDARD OF REVIEW

Rule 702 of the Federal Rules of Evidence permits a witness "who is qualified as an expert by knowledge, skill, experience, training or education" to provide opinion testimony if "(a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to

---

[5] *See, e.g.*, *Penn-Mont Benefit Servs. v. United States*, 2015 WL 5000896 (E.D. Pa. Aug. 20, 2015); *Koresko v. United States*, 123 F. Supp.3d 654 (E.D. Pa. 2015).

understand the evidence or to determine a fact in issue; (b) the testimony is based on the

sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R.

Evid. 702.  This rule "embodies a trilogy of restrictions on expert testimony:  qualification,

reliability, and fit."  *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir.

2003).

Qualification requires "that the witness possess specialized expertise."  *Id.*  To be

"qualified" to serve as an expert, an expert must possess "specialized knowledge regarding the

area of testimony."  *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327 (3d Cir.

2002) (internal quotation marks and citation omitted).  Nevertheless, whether a proposed expert

has the requisite specialized expertise is determined through a wide lens.  *In re Paoli R.R. Yard*

*PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (eschewing "overly rigorous requirements of

expertise and [in favor of] more generalized qualifications.")  "A broad range of knowledge,

skills, and training" will suffice to qualify an expert, *id.,* including "practical experience".

*Waldorf v. Shuta*, 142 F.3d 601, 627 (3d Cir. 1998).  But at a minimum, the proffered expert

must "possess skill or knowledge greater than the average layman. . . ."  *Aloe Coal Co. v. Clark*

*Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987).

Reliability requires that the expert's opinion be premised on more than mere "subjective

belief or unsupported speculation; the expert must have good grounds for his or her belief."  *In re*

*Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 (internal quotation marks omitted) (quoting *Daubert*,

509 U.S. at 590).  When assessing reliability, a court "must examine the expert's conclusions in

order to determine whether they could reliably flow from the facts known to the expert and the

methodology used."  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (internal

quotation marks and citation omitted).

And "fit" means that the expert's opinions "must be relevant for the purposes of the case", *Schneider*, 320 F.3d at 404, in that they must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702). The standards set forth in Federal Rule of Evidence 401 govern the analysis of whether a proffered expert's testimony is relevant. *United States v. Ford*, 481 F.3d 215, 218 (3d Cir. 2007) (internal citation and quotation marks omitted). Fed. R. Evid. 401 ("[e]vidence is relevant if: it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action.") "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotation marks and citation omitted).

For a party to prevail against a *Daubert* challenge to its expert, the party offering the expert must demonstrate by a preponderance of the evidence that its expert and his opinions satisfy each of the three requirements—qualification, reliability and fit. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999); *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417-18 (3d Cir. 1999). District courts play only a "gatekeeping role" to ensure that expert testimony propounded in a case is both reliable and relevant. *See Daubert*, 509 U.S. at 597; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) ("*Kumho Tire*"). This gatekeeping obligation is, however, "not intended to serve as a replacement for the adversary system." Fed. R. Evid. 702 advisory committee's note to 2000 amendments (internal citation and quotation marks omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 508 U.S. at 596. For this reason, there is a "liberal policy of admissibility if

[the testimony] has the potential for assisting the trier of fact." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (internal quotation marks and citation omitted); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("A review of the caselaw . . . shows that the rejection of expert testimony is the exception rather than the rule."); *Daubert*, 509 U.S. at 587 (stating that the standard of relevance is "a liberal one.").

## III.   DISCUSSION

### a.   The Report of Lance Wallach

Plaintiffs offer the report of Lance Wallach, a retired life insurance salesman, to explain the history of the sale of life insurance through Section 419 plans, the relationship between insurance companies and these plans including the companies' efforts to sell their policies under these plans and market them, issues relating to the tax and tax-exempt status of welfare benefits plans including the relationship between the 419A(f)(6) exception and cash value life insurance, and the IRS' efforts to limit the scope of the Section 419A(f)(6) exception through administrative actions, the duties of those involved in the sales of insurance policies to inform purchasers of the risks involved with Section 419A(f)(6) plans and Koresko's poor reputation in the insurance industry.  Defendant moves to exclude all of these opinions on grounds that Wallach is not qualified, and his opinions are neither relevant nor reliable.

Defendant first attacks Wallach's qualifications to offer expert testimony opinions on the general relationship between insurance companies and 419A(f)(6) plans, and their efforts to market these plans to promote sales of their policies.  Defendant describes Wallach as having "some experience with the life insurance industry *in general*" but faults him for lacking "*any* specialized knowledge relating to the issues in this case."  Defendant contends that Wallach lacks knowledge of "insurance company practices or procedures with response to issuing or

processing policy loans," and that Wallach did not review any of the documents produced in discovery by Defendant pertaining to Koresko's specific arrangement.

Though Defendant is correct that a witness must "possess specialized expertise" to be properly considered an expert, *Schneider*, 320 F.3d at 404, it misinterprets and needlessly burdens the yoke imposed by the qualification requirement.  As previously stated, "[a] broad range of knowledge, skills, and training" including "practical experience" can render an expert sufficiently qualified.  *Waldorf*, 142 F.3d at 627.  Indeed, "overly rigorous requirements of expertise" are to be eschewed in favor of "more generalized qualifications."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 741.

Against this lenient standard, Wallach possesses specialized knowledge sufficient to qualify him to opine on general practices in the insurance industry, and the tax implications for these plans.   His specialized knowledge derives from his decades-long sales experience with cash value life insurance policies and tax-exempt and non-tax-exempt plans in the insurance industry.  Defendant's challenges to Wallach's qualifications and the materials he considered go to the weight, not the admissibility of his opinions.  *See, e.g.*, *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined to a jury."); *Waldorf*, 142 F.3d at 627 ("[O]nce the trial court has determined that a witness is competent to testify as an expert, challenges to the expert's . . . knowledge go to the weight to be accorded the expert testimony rather than to its admissibility." (internal citation omitted)).

Defendant next challenges the reliability of Wallach's opinions on insurance companies' practices marketing and selling life insurance through 419 plans.  Defendant contends that Wallach's opinions are not reliable because he "employed *no methodology at all*" as he did "not

review any of the actual evidence, documents or witness testimony" and instead based his opinions on his "vague recollections" of his experience with "Koresko and the marketing of his 419 plan from "many, many years ago."  Plaintiffs, however, defend the reliability of Wallach's marketing opinions by arguing that they are "based on [Wallach's] own experience in the 419 industry," which the commentary to the Federal Rules of Evidence expressly permits.

As noted before, to satisfy the reliability requirement, an expert "must have good grounds for his or her belief"; he may not rely on "subjective belief or unsupported speculation."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 (internal quotation marks and citation omitted). Though it is true that in some cases, an expert's "training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it," *Oddi*, 234 F.3d at 158, for the reasons that follow this is not one of those cases.

In forming his opinions on the general marketing practices of insurance companies, Wallach did not rely on any specific documents or materials, such as documents produced in this litigation or transcripts of witness testimony.  Although he testified at his deposition that he had reviewed "some lawsuits against John Koresko" and "depositions of home office people" he was unable to provide any further detail or identify these litigations and depositions.[6]

He primarily relied on his experience in the insurance industry, namely, his decades-old memories pertaining to the marketing and sales of 419A(f)(6) plans.  However, his memory proved shaky when it came time to recall his experience marketing plans in the insurance industry.  He described his memories of that experience as "vague" albeit "very very interesting."  In an effort to "refresh [his] memories as to what was happening years ago," Wallach turned to the internet.  Specifically, he conducted internet searches for materials, such as

---

[6] In deciding a *Daubert* motion, courts will consider an expert's deposition testimony.  *See, e.g.*, *Kumho Tire*, 526 U.S. at 142-43; *Oddi*, 234 F.3d at 148-51.

marketing materials and brochures, related to Defendant John Hancock and voluntary employees' beneficiary associations ("VEBAs"), like the arrangement offered by Koresko. He recalled that Defendant and some number of other insurance companies (though he could not recall how many or which companies exactly) would provide brochures at sales meetings to brokers, insurance agents, accountants and attorneys to market Koresko's arrangement. As Wallach recalled, these brochures often displayed the insurance companies' logo as well as the logo of the plan sponsor.

When Wallach's own internet searches came up short in finding these brochures, he enlisted "a few other random people that were more computer savvy" to assist. They too were unable to find the documents which led Wallach to conclude that "[Defendant] John Hancock probably scrubbed it or took it off the internet once [it] realized [it was] going to be sued." Wallach also testified that he had called "some people that I recalled from years ago to see what they remembered," though he failed to identify how many people he spoke to or who these people were. The only detail Wallach could provide about these calls was that one of them was with "an attorney on my Facebook" to "see if he could remind me—of certain things." Wallach could not recall the name of the attorney, only that he had been "active in those years."

Contrary to Plaintiffs' arguments, vague recollections do not amount to the kind of professional experience required for an opinion to be admissible as that of an "expert." An expert who bases his opinions on personal experience must employ "the same level of intellectual rigor that characterizes the practice of an expert in the reasonable field." *Kumho Tire*, 526 U.S. at 152. In this case, though Wallach purports to rely on his own experience in the insurance industry, he himself described his memories about the issues upon which opines as "vague." He made equally clear that he was unable to find any documentation or other evidence

which supported or otherwise refreshed his vague recollections of insurance company practices with respect to VEBAs and 419A(f)(6) plans.  Nevertheless, he forges ahead to opine on how insurance companies marketed these plans with the plan sponsors to agents and brokers, and how marketing materials were used.

Wallach's vague memories of his experience do not provide a sufficiently reliable foundation for an expert opinion.  His memories can neither be tested nor verified; indeed, Wallach own attempts to verify his memories through internet research proved unsuccessful.  At best, Wallach's opinions on insurance companies and their marketing practices amount to "subjective belief or unsupported speculation."  Accordingly, that portion of Wallach's report which concerns the history of the sale of life insurance plans and the relationship between insurance companies and these plans including the companies' efforts to sell their policies under these plans and market them shall be excluded, and Wallach may not testify as an expert on these matters.  *See, e.g.*, *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp.2d 477, 481 (S.D.N.Y. 2000) (excluding expert report that was "a compendium of [the expert's] opinions . . . and was not methodologically sound enough to provide reliable evidence" under *Daubert*).

Notably, Defendant does not challenge the reliability of Wallach's opinions on issues relating to the tax and tax-exempt status of welfare benefits plans including the relationship between the 419A(f)(6) exception and cash value life insurance, and the IRS' efforts to limit the scope of the Section 419A(f)(6) exception through administrative actions.  But it does challenge their "fit" to this case.  Specifically, Defendant argues that his opinions are not relevant and must be excluded because they do not pertain to the loan it made to Koresko and because they are not helpful in that the factfinders are "perfectly capable of understanding these issues on their own" because "most, if not all, members of the jury would have familiarity with the purchase and sale

of life insurance and estate planning" and therefore presumably already understand the tax and tax-exempt status of benefit plans and IRS actions regarding the same. These arguments, however, espouse overly narrow views of relevance and overly generous views of what constitutes common knowledge.

As previously explained, the standard of relevance under *Daubert* "is a liberal one." *Daubert*, 509 U.S. at 587. If an opinion "assist[s] the trier of fact to understand the evidence or to determine a fact in issue[,]" it is relevant. *Daubert*, 509 U.S. at 591. Under this lenient standard, Wallach's opinions on the tax implications of welfare benefit arrangements and the relationship between the 419A(f)(6) exception and cash value life insurance are relevant. These opinions have the potential to aid the trier of fact in making sense of the complex background underlying this action.

And contrary to Defendant's argument that this is all common knowledge, the details of taxation, let alone the details of the taxation of an area as niche as welfare benefit plans, are so notoriously complex that they have perplexed even the greatest minds. *See, e.g.*, *Murphy v. Internal Rev. Serv.*, 460 F.3d 79, 92 (D.C. Cir. 2006) (attributing to Albert Einstein that "[t]he hardest thing in the world to understand is . . . tax." (alteration in original) (internal citation and quotation marks omitted)), *judgment vacated on other grounds*, 493 F.3d 170 (D.C. Cir. 2007). For this reason, expert testimony on issues pertaining to taxation and welfare plans is not only relevant but is helpful to understand the complex fraud scheme underlying this case. *See, e.g.*, *United States v. Barkley*, 985 F.2d 574 (9th Cir. 1993) (permitting a law enforcement agent specializing in fraud to testify on strategies used to evade taxes). Accordingly, the portion of Wallach's report pertaining to issues relating to the tax and tax-exempt status of welfare benefits plans, including the relationship between the 419A(f)(6) exception and cash value life insurance,

and the IRS' efforts to limit the scope of the Section 419A(f)(6) exception through administrative actions, is admissible.  Defendant's Motion to exclude these opinions shall therefore be denied.

Defendant also challenges the propriety of Wallach's opinions on Koresko's poor reputation in the insurance industry, particularly an alleged penchant for drug use and excessive drinking as an inappropriate topic for expert testimony.[7]  Wallach opines that he was "amazed that some insurance companies continued to do business with Koresko" because it "was widely known in the industry that he had a cocaine and drinking problem and that [Koresko] had been arrested for driving under the influence."  At his deposition, Wallach testified that these opinions were not exclusively based on his personal knowledge or first-hand experiences but were based on rumors and Wallach's recollections regarding Koresko's general reputation within the insurance industry.

Plaintiffs make no effort to defend Wallach's opinions on Koresko's alleged drug use and drinking habits as those of an expert, but instead argue that they are admissible because they are relevant to "evaluate [Defendant's] actions and intent" and fall within an exception to the rule against hearsay for testimony on "reputation concerning character."  But whether such testimony falls within a hearsay exception is not before the Court.  The question is whether it is appropriate expert opinion testimony.  And, since Plaintiffs have conceded that it is not, Wallach will not be permitted to testify as an expert on Koresko's reputation.

### b.  The Report of Burke Christensen

Plaintiffs also offer an expert report by Burke Christensen, an attorney who has worked

---

[7] Wallach also offers an opinion that the sellers of insurance policies through 419A(f)(6) plans had a duty to inform purchasers about the risk associated with these plans.  Defendant challenges this opinion as irrelevant and offering an impermissible legal opinion.  Plaintiffs concede that this opinion is not relevant to this case.  Accordingly, the portion of Wallach's report opining on a duty to warn of risks associated with 419A(f)(6) plans shall be struck as unopposed on grounds of relevance.

in the insurance industry for 40 years rising to the heights of Chief Operating Officer and General Counsel of an insurance company.  He has also taught on insurance as a professor at the Eastern Kentucky University and the Wharton School of the University of Pennsylvania.  In his report, Christensen explains the "different types of life insurance and preferences of insurance companies with respect to the sale of those products," the "mechanics of policy loans," the "origin history of Section 419A welfare benefit plans," and "the relationship between insurance companies and the agency system" *i.e.*, insurance agents, brokers and producers.  Christensen ultimately concludes that, "the record provides no evidence supporting that the insurer here followed standard industry practices or its own procedures for assuring that policy ownership rights . . . were exercised only by the owner of the policy."

Defendant moves to strike Christensen's report in its entirety because: (1) Christensen is not qualified to opine on the mechanics of policy loans; (2) his opinion is unreliable because he failed to consider certain deposition testimony and documents; (3) the background information on term and ordinary life insurance policies and the history of 419 plans is not relevant; and, (4) his opinion on the relationship between insurance companies and agents amounts to an impermissible legal opinion.  None of these arguments are persuasive.

Defendant questions Christensen's qualifications on the grounds that he "has never worked in the disbursements department of any life insurance company [and] has never processed a loan for a life insurance policy."  His experience with policy loans lies rather in seeking to obtain policy loans as a broker for his clients which involved understanding how to apply for a loan, what to do if the loans exceeded the cash value of the policy and the tax consequences of such loans as well as his experience instructing insurance agents across the country on "what they needed to know with respect to policy loans."  These experiences render

him sufficiently qualified to opine on the general mechanics of these loans.  Although Defendant believes that someone with experience processing a loan or working in the loan disbursements department of a life insurance company would be a better qualified expert, a party's view that its opponent's expert is not "the best qualified" is of no moment to the analysis of a potential expert's qualifications so long as the proposed expert has specialized expertise regarding the area of his testimony—which, in this case, Christensen does.  *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).

Defendant also questions the reliability of Christensen's report because it does not cite to "any independent industry standards for loan processing," does not provide citations to the deposition of Defendant's corporate representative, Gina Stewart, and does not consider the depositions of certain employees or documentation it produced in this litigation.  Christensen's failure to provide citations to specific "industry standards for loan processing" does not doom his report, as his opinions instead derive from a "set of observations based on extensive and specialized experience."  *Kumho Tire*, 526 U.S. at 156.  Both this issue and his failure to consider (or cite to) the entire corpus of potentially relevant information are issues that go to the weight, not the admissibility, of his opinions.  *See, e.g.*, *Tuman v. Genesis Assocs.*, 935 F. Supp. 1375, 1385 (E.D. Pa. 1996) ("[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).  Where an expert witness has "some factual basis—albeit shaky" to support his opinion, the proper solution is to allow an adverse party to "highlight those weaknesses through effective cross-examination."  *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414, 415 n.3 (3d Cir. 2002).

It should also be noted that Defendant faults Christensen for not considering in reaching his opinions its internal policies and procedures concerning policy loans. This protest is audacious in the extreme. Here's why. Although Plaintiffs requested these documents more than once during discovery, Defendant did not produce them. At the depositions of two of Defendant's witnesses—the deposition of Carol Savage and the deposition of Defendant's 30(b)(6) corporate representative, Gina Stewart—Plaintiffs requested the Defendant's internal policies on policy loans representing that they fell within the scope of its prior document requests. Plaintiffs then followed up in writing requesting "written procedures governing loans for trust owned policies."[8] But, Defendant produced no responsive documents. Either there are responsive documents—but Defendant in violation of discovery rules chose not to produce them. *See* Fed. R. Civ. P. 26(c); 37(c)(1). Or, there are no responsive documents—and there being none the expert cannot be expected to have reviewed them. Certainly, to the extent that Defendant relies on its internal policies and procedures on policy loans in arguing its *Daubert* Motion, these arguments are not well taken.[9]

Defendant also questions the relevancy of Christensen's opinions on insurance policies and the history of 419 plans. Plaintiffs explain that the "differences between term and cash value policies relate directly to why insurance companies became involved in 419 plans and were interested in selling and marketing them" and "[t]he history of 419 plans and the relationship between the insurance companies' Advances Sales departments and the marketing of insurance through these plans is directly relevant" to their RICO claim. Specifically, Plaintiffs contend

---

[8] In fact, Plaintiffs moved for sanctions in the form of judgment or an instruction in its favor for, among other things, Defendant's failure to produce these documents. Plaintiff's Sanctions Motion was summarily denied because they did not raise any disputes during the lengthy discovery period, did not meet and confer with Defendant, and the relief they sought was too extreme.

[9] Plaintiffs also represent that Defendant inappropriately relies on these policy documents in its motion for summary judgment. This motion is not presently before the Court so judgment on this issue shall be reserved.

these opinions are relevant to issues regarding "the association-in-fact issues" and the "insurance companies' role in the association."

As previously explained relevancy presents a relatively low obstacle to clear. *United States v. Ford*, 481 F.3d 215, 219-20 (3d Cir. 2007) (stating that the standard for relevance is "not that high."). Expert opinions which have "the potential for assisting the trier of fact" are relevant. *Schiff*, 602 F.3d at 173 (internal citation and quotation marks omitted).

Like the admissible portions of Wallach's report, Christensen's opinions on the types of insurance and the history of 419 plans make Koresko's scheme and Plaintiffs' theories of liability more comprehensible to the fact finder. Rule 702 permits an expert to use his expertise to decipher concepts or terms which may be beyond a layperson's knowledge. *See, e.g.*, *United States v. Gibbs*, 190 F.3d at 211 (stating that expert testimony explaining the meaning of the Philadelphia slang term "jawn" was appropriate). Though Defendant insists that the average juror would be familiar enough with the details of life insurance and welfare benefit plans such that Christensen's opinions are unnecessary, Defendant's assumptions regarding the acquaintance with these types of arrangements of pretty much anyone not deeply immersed in the esoterica of its business are as misguided as an out-of-tune banjo playing Handel's Messiah. Accordingly, Defendant's Motion shall be denied with respect to these opinions.

Finally, Defendant argues that Christensen offers a legal opinion in explaining the relationship between insurance companies and agents and brokers. In the challenged portion of Christensen's report, he states that insurance companies generally do not sell their products directly to the public, but instead use brokers and agents as intermediaries. He further states that—in days gone by—these intermediaries exercised different obligations towards the insurance company and the policy-holder but that these distinctions are largely gone.

Christensen also provides further detail on the various types of agents and brokers, and how they relate to each other and the insurer.  Defendant contends that these are legal opinions because they describe the legal agency relationship between insurers and agents, and further argues that they do not accurately describe the law.  Plaintiffs, however, contend that Christensen is not offering a legal opinion as to whether there is a legal agent-principal relationship but is "describing the substantive nature of the relationship."

It is a general rule that "an expert witness is prohibited from rendering a legal opinion." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (citing Fed. R. Evid. 704). "In other words, experts are not permitted to explain the law or render opinions on what the law requires."  *T.N. Incorp., Ltd. v. Fidelity Nat'l Info. Servs., Inc.*, 2021 WL 5980048, at *12 (E.D. Pa. Dec. 7, 2021) (citing *Berckeley Inv. Grp., Ltd.*, 455 F.3d at 218).  However, an expert may testify on business customs and practices which use legal terminology or mention duties.  *See, Berckeley Inv. Grp., Ltd.*, 455 F.3d at 218, *Crowley v. Chait*, 322 F. Supp.2d 530, 550 (D.N.J. 2004).

Here, it is not apparent from Christensen's report that he is providing a legal opinion. Nor, as Defendant represents, did Christensen admit he opines on issues of law at his deposition. Rather, he testified that he was only opining on "the standards of the industry . . . with respect to a particular action."  Indeed, he testified that these opinions were based on his prior publications which were informed by industry standards set forth by the National Association of Insurance Commissioners, not any laws.

As Defendant would have it, Christensen must be opining on legal issues because he uses the terms "agent" and "duty" in describing how insurers and policy-holders associate with insurance agents.  But that conclusion does not necessarily follow: he may simply be employing

legal terminology to describe his experience regarding customs in the insurance industry. *See, e.g.*, *Crowley*, 322 F. Supp.2d at 250. Defendant has simply not provided any cogent explanation as to *why*—in its views—these opinions are legal in nature. To prevail on its argument, Defendant would have had to "offer some argument or development of its theory" because "[c]ourts rely on the litigants. . . to frame the issues for decision." *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010). Without more developed exposition, Defendant has failed to demonstrate that this portion of Christensen's report should be excluded for opining on legal issues.

### c. The Report of John L. Pund

Plaintiffs offer the report of John L. Pund, an attorney, certified public accountant and forensic accountant with forty-years of experience in insurance related matters, to assess damages and summarize Koresko's arrangement and how it was executed. Pund's summary chronologically sets forth the creation and execution of Koresko's arrangement by considering the various documents and agreements used by Koresko to create his arrangement, including those to which Plaintiffs were Parties, as well as prior judicial findings and analyses made by the Department of Labor. Defendant moves to exclude only this summary, arguing that it is not an expert opinion, but amounts to a "color commentary" of the record. Defendant further contends Pund is not qualified to provide such commentary.

Plaintiffs concede that the challenged portion of the report is not an expert opinion but argues that it is admissible as a summary opinion under Rules 611 and 1006 of the Federal Rules of Evidence. As previously explained, whether an opinion is admissible under some rule of evidence separate from the rules governing expert opinions is an issue best saved for later in this

litigation.[10]  But as Plaintiffs have conceded that Pund's summary is not admissible as an expert opinion—the only issue presently before the Court—the summary shall be excluded on this basis.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's *Daubert* Motion shall be granted with respect to the portions of Wallach's report which pertain to insurance companies' marketing practices, Koresko's reputation and the duties of sellers of insurance policies through 419A(f)(6) plans, and the summary portion of Pund's report.  Defendant's Motion shall be denied in all other respects.

An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.

_____

WENDY BEETLESTONE, J.

---

[10] This Court takes pause to note that while courts have exercised their discretion to permit the use of summary testimony in certain cases, they have imposed strict limitations on the use of this testimony given the danger of jury confusion.  *See, e.g.*, *United States v. Fullwood*, 342 F.3d 409, 413-14 (5th Cir. 2003); *United States v. Baker*, 10 F.3d 1374, 1412 (9th Cir. 1993), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000) ("We are not blind to the dangers of witnesses summarizing oral testimony, and we believe that such summaries should be admitted under Rule 611(a) only in exceptional cases."); *United States v. Johnson*, 54 F.3d 1150, 1162 (4th Cir. 1995) ("The dangers inherent in using a summary witness . . . are plain and are only exacerbated in circumstances . . . where the witness was also testifying in the role of an expert.").  One such limit on the use of summary testimony is that the witness cannot act as an "advocate summarizing and organizing the case for the jury. . . ."  *Fullwood*, 342 F.3d at 414.  At present, Pund's summary reads more as a piece of advocacy than a "summary" of "voluminous writings, recordings, or photographs which cannot conveniently be examined in court." Fed. R. Evid. 1006.