**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ARIC D. HAUSKNECHT, COMPLETE MEDICAL CARE SERVICES OF NY, PC AND COMPLETE MEDICAL CARE SERVICES OF NY, PC HEALTH AND WELFARE BENEFIT PLAN,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| | **NO. 17-3911** |
| **v.** | |
| **JOHN HANCOCK LIFE INSURANCE COMPANY OF NEW YORK,** | |
| **Defendant.** | |

**O P I N I O N**

Plaintiffs Aric D. Hausknecht, Complete Medical Care Services of NY, P.C. and

Complete Medical Care Services of NY, PC Health and Welfare Benefit Plan contend that

Defendant John Hancock Life Insurance Company ("John Hancock") violated two sections of

the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2)-(3),

and two sections of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. §§ 1962(c)-(d), by taking certain actions as the insurer of life insurance policies which

were devalued through a larger, complex scheme to swindle funds from welfare benefit plans

operated by one John Koresko.  Defendant countersued for breach of an indemnification

contract, which contract was between Plaintiff CMCS and Defendant's predecessor by merger,

Manufacturer's Life Insurance Company of New York ("ManuLife").

Plaintiffs now move for summary judgment on their ERISA claims, and Defendant cross-

moves for summary judgment on Plaintiffs' ERISA and RICO claims as well as its own

counterclaim for breach of contract.  For the reasons that follow, Plaintiffs' Motion shall be

denied, and Defendant's Motion shall be granted with respect to the RICO claims, granted in part

1

and denied in part with respect to the ERISA claims, and denied with respect to its counterclaim for breach of contract.

I.     **BACKGROUND**

   a.  **The Preliminary Question of Judicial Notice**

This is one of many cases involving John Koresko's welfare benefit plan scam.  Most of the suits, such as the instant one, involve individual plaintiffs and corporate defendants.  But in the largest matter, now closed, the United States Secretary for the Department of Labor sued John Koresko and others associated with him.  The Department alleged that Koresko and his associates violated four sections of ERISA, 29 U.S.C. §§ 1103, 1104, 1105, 1106, by holding plan assets despite not being trustees of those plans, violating their fiduciary duties of loyalty and care, and conducting prohibited transactions ("the Department of Labor matter").  The Department of Labor matter gave rise to numerous opinions.  *See, e.g.*, *Solis v. Koresko*, 884 F. Supp.2d 261 (E.D. Pa. 2012), *aff'd sub nom. Sec'y of U.S. Dep't Labor v. Koresko*, 646 F. App'x 230 (3d Cir. 2016); *Perez v. Koresko*, 86 F. Supp.3d 293 (E.D. Pa. 2015), *aff'd sub nom. Sec'y of Labor*, 646 F. App'x 230.  Although neither the Plaintiffs nor the Defendant here were parties to that litigation, Plaintiffs ask that the Court take judicial notice of certain findings of fact found in opinions written in the Department of Labor matter such that they would be considered as part of the record for purposes of determining the instant Motions.  Defendant opposes Plaintiffs' request because it was "not a party to that case and cannot be bound by its conclusions."  The question—whether findings of fact made in different proceedings related to Koresko's misuse of welfare benefit plan assets may be considered as part of the record here—is a threshold issue which must be addressed prior to diving into an evaluation of the Motions for Summary Judgment.

Judicial notice is an "evidentiary doctrine that permits the court to consider as established in a case a matter of law or fact without the necessity of formal proof of the matter by any party." 21B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5102 (2d ed. updated 2022) (internal citations and quotation marks omitted). It is a familiar concept which, when used to best effect, saves time and expense in litigation. There are two primary schools regarding the precise contours of the doctrine: the "procedural convenience" school which is grounded on "the procedural value of efficiency" advocates for judicial notice "if a fact seemed obviously true to the judge"; whereas the "jury control" school adopts a limited view of judicial notice in that courts are cabined to noticing only those facts which are "indisputable" to avoid the risk of judicial overreach. *Id.* (internal quotation marks omitted). The federal rule which governs judicial notice, Federal Rule of Evidence 201, adopts the second view and limits judicial notice to facts which are: (1) adjudicative, not legislative; (2) not subject to reasonable dispute; and, (3) either "generally known within the trial court's territorial jurisdiction" or can "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

In taking the position that judicial notice of the factual findings from the Department of Labor action is appropriate, Plaintiffs assert only that "[t]his Court may take judicial notice of these facts in the context of a motion for summary judgment. F. R. E.[*sic*] Rule 201 ('The court may judicially notice a fact that is not subject to reasonable dispute because it: (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned'. . . .)." They, however, do nothing to demonstrate that each of the Rule's three requirements is satisfied. Where, as here, a party's argument consists of no more than "conclusory assertion[s]," the argument is deemed waived. *See Reynolds v. Wagner*, 128 F.3d

3

166, 178 (3d Cir. 1997).  Absent cogent argument in support of their position, their argument

must accordingly be ignored.  *See, e.g.*, *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir.

2010) (a litigant "must unequivocally put its position before the trial court at a point and in a

manner that permits the court to consider its merits." (quoting *Shell Petrol., Inc v. United States*,

182 F.3d 212, 218 (3d Cir. 1999))).[1]

The findings of facts and conclusions in the Department of Labor matter will therefore

not be considered as part of the record here and will not be used to determine whether entry of

summary judgment for either party is appropriate.  However, the existence of this prior litigation

and its procedural history will be noticed as and where appropriate.  *See, e.g.*, *S. Cross Overseas*

*Agencies, Inc.*, 181 F.3d at 426; *O'Boyle v. Braverman*, 337 F. App'x 162, 164-65 (3d Cir.

2009).[2]

### b.  Setting the Stage

Now onto the main event.  This story arises from a complex scheme run by John Koresko

and his affiliates to steal tens of millions of dollars from hundreds of welfare benefit plans.  In

---

[1] Quite separately, if Plaintiffs' point was correct, the doctrines of res judicata or collateral estoppel would be
severely circumscribed and of limited value—findings made in one case could make their way into a different one
simply through the use of judicial notice.  *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998); *United
States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994); *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d
1384, 1388-89 (2d Cir. 1992).  Such an outcome would not only be inconsistent with the limited view of judicial
notice adopted by the Federal Rules, but it would also undermine a party's rights to marshal evidence, confront
witnesses and argue before a fact-finder and right to a fair trial.  *See* Fed. R. Evid. 201, advisory committee's note;
*Jones*, 29 F.3d at 1553.  For these reasons, every Court of Appeals that has considered the issue has held that it is
improper to judicially notice the truth of prior judicial findings of fact.  *See, e.g.*, *S. Cross Overseas Agencies, Inc. v.
Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (noting that on a motion to dismiss, a court may
take judicial notice of another court's opinion "not for the truth of the facts recited therein, but for the existence of
the opinion. . . ."); *Liberty Mut. Ins. Co.*, 969 F.2d at 1388-89; *Taylor*, 162 F.3d at 829-30; *Jones*, 29 F.3d at 1553;
*Tobey v. Chibucos*, 890 F.3d 634, 647-48 (7th Cir. 2018); *Holloway v. Lockhart*, 813 F.2d 874, 878-79 (8th Cir.
1987).

[2] As it has been in other opinions in this litigation, *see, e.g.*, *Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 334
F. Supp.3d 665 (E.D. Pa. 2018) and *Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 2022 WL 1664362, at *1 n.1
(E.D. Pa. May 25, 2022), which acknowledged that the Department of Labor matter cast a long shadow on the
instant dispute.

the decade of litigation following the discovery of this scheme, the focus of these suits has shifted from Koresko to the insurers which provided life insurance policies used in the welfare benefit plans. Plaintiffs are some of Koresko's victims and contend that Defendant John Hancock and its predecessor by merger, ManuLife, were in on Koresko's scheme. Specifically, Plaintiffs contend that Defendant was an ERISA fiduciary because it exercised undirected control by changing the owner of the life insurance policy on Plaintiff Aric Hausknecht's life and when it issued a loan on said policy, and that Defendant breached such fiduciary duties. Plaintiffs also argue that Defendant was part of a RICO enterprise with Koresko and his cohorts.

To follow the narrative, one must be familiar with the myriad characters involved and the roles they played. Plaintiff Aric D. Hausknecht is a physician who owns and operates Plaintiff Complete Medical Care Services of New York ("CMCS"). He established a welfare benefit plan, the Complete Medical Care Services of NY, PC Health and Welfare Plan ("CMCS Plan")—also a Plaintiff in this case—after consulting with an independent insurance broker.

To run this arrangement and perpetrate his fraud, Koresko established several entities. These entities included the Regional Employers' Assurance Leagues ("REAL")—a loose, unincorporated association of unrelated employers through which Koresko offered to employers his program of employee welfare benefit plans and benefits. Koresko also established two trusts, the Regional Employers Assurance League Voluntary Employees' Beneficiary Association Trust ("REAL VEBA Trust") and the Single Employer Welfare Benefit Plan Trust ("Single Employer Trust"). Four different entities, First Union National Bank ("FUNB"), Community Trust Company ("CTC"), Farmers & Merchants Trust Company ("F&M") and Penn Public Trust ("PPT"), served as the two Trusts' trustees in that order. The last of these trustees, PPT, was established and owned by Koresko. Koresko also founded, owned and served as the director of

PennMont Benefits Services, Inc ("Penn-Mont"), which served as the administrator for each employer's plan, including the CMCS Plan.  Finally, Koresko founded and wholly owned two law firms—the Koresko Law Firm and Koresko & Associates, P.C.—which represented and acted on behalf of the other Koresko entities.

To join the arrangement, Hausknecht and CMCS executed several interrelated documents, which consolidated power into the hands of John Koresko and his affiliates, including Penn-Mont and the trustee of the REAL VEBA Trust.[3]  These documents established and named Plaintiffs' welfare benefits plan, the CMCS Plan, and referenced certain entities and persons involved in the management of the plan and the Koresko arrangement.  They named Koresko a fiduciary of the CMCS Plan, authorized him to complete any documents on behalf of Hausknecht which Penn-Mont determined to be incident to the CMCS Plan, and provided that his signature alone could direct the Trustee to act in matters related to the REAL VEBA Trust and the CMCS Plan.  These documents similarly authorized Penn-Mont to: (1) complete and execute any documents on behalf of Hausknecht which it determined were related to the CMCS Plan; (2) to instruct the Trustee to act on behalf of the REAL and CMCS; and, (3) solely delegate any and all fiduciary responsibilities under the REAL VEBA Trust.  The Trustee, which was FUNB at the time of execution, could take all manner of action on behalf of the REAL VEBA Trust at the direction of Penn-Mont, or Koresko.  Koresko and Penn-Mont thus held all the authority to act on behalf of the CMCS Plan, Hausknecht and the REAL VEBA Trust, and could direct the Trustee to exercise its powers to do their bidding.[4]

---

[3] These documents included an "Adoption Agreement" which required Plaintiffs to adopt and agree to the "REAL Health and Welfare Plan Document"—a prototype plan document created by Koresko, a Master Trust Agreement called the "REAL VEBA Trust Agreement" and an "Employee Participation Agreement."

[4] Notably, the Parties dispute, and it is not clear from the record, whether three of these four documents—the Adoption Agreement, the Plan Document, and the Master Trust Agreement document—were provided to Defendant, if so, when they were provided, or whether Defendant had any knowledge of these documents or their terms.

Once the CMCS Plan was established, life insurance policies were taken on the lives of plan participants though the Trustee, then FUNB, which was named as the owner for the benefit of the welfare benefit plans.  The Trust functioned as a pass-through vehicle, receiving insurance premiums paid by the employer and paying them to the insurance company for the policies.  In this case, at Hausknecht's request, a written application was submitted on behalf of the CMCS Plan to ManuLife for a $6 million premium variable universal life insurance policy on Hausknecht's life (the "Policy" or the "Hausknecht Policy").  The application listed the owner as "REAL VEBA TRUST/FBO COMPLETE MEDICAL CARE OF NY P.C. WBP" and its address as a King of Prussia P.O. Box left to the care of "PENN-MONT BENEFIT SERVICES, Inc."  The application listed the beneficiary for the Policy as the "OWNER/TRUSTEE."  The application itself did not identify the trustee, but the signature line for the owner/taxpayer was signed and stamped "FUNB Trustee."  The application also did not specify the role or relationship of Penn-Mont to the Policy and the trustee.  ManuLife issued the Policy in 2002. Defendant John Hancock, ManuLife's successor, now holds the Hausknecht Policy.

Aside from John Koresko and his companies, two other individuals were key to his arrangement.  The first is his brother, Lawrence Koresko,[5] who was the Vice President and part-owner of Penn-Mont and worked *inter alia* as an independent insurance broker at Koresko

---

Defendant and its employees have submitted sworn statements which maintain that it did not receive any of these documents and was not aware of their terms, but other evidence in the record states that it would have received these materials at two distinct times: first, when it approved its policies to be sold in connection with the Koresko arrangement, and second, when it received the application on Hausknecht's life.  Lawrence Koresko testified that he provided insurance companies, often at their request, with "a document page which would include plan and trust documents, the Adoption Agreements, any marketing materials" and "anything else that might be germane to something that would govern the operation of the plan and trust" which he believed were "normally reviewed by the insurance company" before the companies would approve their policies to be sold in connection with the Koresko arrangement.  And the independent insurance broker who Plaintiffs consulted prior to joining the arrangement testified that it was his practice to submit "all the documentation to the insurance carrier" including "all the trust agreements and all of that stuff" when submitting an application for an insurance policy.

[5] Unless otherwise noted, "Koresko" as used in this opinion refers only to John Koresko.

Financial, an insurance wholesaler he founded and jointly owned with his brother John.

The other key person involved in the execution of the Koresko scheme is Jeanne Bonney. She, like the Koreskos, held a variety of hats in the arrangement. The record indicates that she was an attorney employed by Koresko's two law firms, was affiliated with Penn-Mont and served as the Attorney in Fact for the REAL.

The final character in this story is the Department of Labor which, as mentioned *supra*, sued the REAL VEBA Trust, the Single Employer Trust, Koresko, Bonney, CTC, and Koresko's law firms for violating ERISA by misusing funds from hundreds of welfare benefit plans. Ultimately, in February 2015, the Department of Labor prevailed in its lawsuit against Koresko and the other defendants in the action—who were determined to be ERISA fiduciaries of the employers' plans and found to have violated various provisions of the law by misusing plan funds, including by taking out loans exceeding $35 million on insurance policies.[6] As relevant here, a loan in the amount of $405,892.44 was issued by Defendant on the Hausknecht Policy, which loan has not been repaid and has continued to accrue interest in the 13 years since it was issued.

These characters, or the "who," are not the only piece to solving the puzzle of the case; the "what" and the "when" are also determinative. Specifically, *who* or *what* entity owned the life insurance policy on Hausknecht's life changed over time (at various points, Koresko and his cohorts told ManuLife and Defendant that the Policy was owned by—the REAL VEBA Trust, the "Complete Medical Services of N.Y. Plan Trust", the Single Employer Trust and the four entities which served as their trustees), as did *who* or *what* had the authority to make changes to the plan (those who claimed authority included, FUNB, CTC, PPT, Bonney and Koresko) and to

---

[6] *See Perez*, 86 F. Supp.3d at 293-300.

the extent of authority they represented themselves to have.  Further, when Defendant learned of *who* or *what* had *what* authority with respect to the Policy is unclear from the record.

## II.      STANDARD OF REVIEW

To prevail at summary judgment, "the movant must show that 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'"  *Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir. 1992 (quoting Fed. R. Civ. P. 56(c)).  A factual dispute is material where it "might affect the outcome of the suit under the governing law. . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a genuine issue is present "when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

The movant bears the initial burden of identifying those portions of the record "it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Then, the non-moving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  Courts must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (internal citation omitted).

## III.     DISCUSSION

### a.  The ERISA claims

Plaintiffs raise claims under two sections of ERISA—Sections 1132(a)(2), which provides for plaintiffs to obtain equitable relief and to recover damages from *fiduciaries* who breach their duties, *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007), and Section

1132(a)(3), which "authorize[s] suits against *any other person* who knowingly participates in a fiduciary's violations of her duties." *See Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 90 (3d Cir. 2012) (internal citations, quotation marks and alterations omitted) (emphasis added).

### b. Defendant's threshold defenses do not compel entry of summary judgment in its favor

A threshold question for the Section 1132(a)(2) claim is whether Defendant was an ERISA fiduciary under the CMCS Plan. Defendant maintains it was not, and that because it was not Plaintiffs' Section 1132(a)(2) claims must fail. First, it argues that it is exempt from liability under a "Hold Harmless Agreement," an executed copy of which was required for the Policy to be issued. The Hold Harmless Agreement provides, *inter alia*, that the signatories to the agreement would release and hold ManuLife harmless from "any and all losses, claims, damages or liabilities" which related to the CMCS Plan, its operation, or the use of life insurance in the Plan. It further provided that it was "the intention of the Employer, Trustee . . . and Plan Administrator" that ManuLife would not be "'fiduciaries for purposes of Title I of ERISA in this transaction." This provision, however, does not obviate the need to address the question of whether Defendant is a fiduciary for the purposes of the claims made here. That is because ERISA invalidates "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation or duty." *See* 29 U.S.C. § 1110(a).[7]

Defendant's next argument that it contends estops any further inquiry and requires entry

---

[7] Defendant argues that the Hold Harmless Agreement is not invalid under ERISA because "the DOL and the Third Circuit have recognized that indemnification of a plan fiduciary by an employer 'is a permitted indemnification provision.'" The case Defendant relies on for this proposition, *Perelman v. Perelman*, 919 F. Supp.2d 512 (E.D. Pa. 2013) is not binding on this court and is distinguishable. The *Perelman* agreement did not shift liability from the fiduciary to the Plan, which the Defendant represents the Hold Harmless Agreement as doing because it contends the Agreement bars any recovery from Defendant by anyone, including the CMCS Plan. *See id.* at 523.

of summary judgment in its favor on the ERISA claims is that they are time-barred. ERISA's statute of limitations provides that an action pertaining to a fiduciary's breach must be brought by the earlier of: (1) six years after the "date of the last action which constituted a part of the breach," or in the case of an omission, "the latest date on which the fiduciary could have cured the breach or violation"; or, (2) "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113. These limitations apply except in cases of "fraud or concealment" in which case an action may be commenced not later than six years after the discovery of the breach or violation. *Id.*

Defendant argues that unless the fraud or concealment exception applies, Plaintiffs' claims are untimely because: (1) the alleged fiduciary breaches occurred in 2003, 2005—when Defendant purportedly changed the owner of the Policy—and 2009—when Defendant issued a loan on the Policy, which would render Plaintiffs' claims untimely in 2009, 2011 and 2015, respectively—years before Plaintiffs' suit was filed in 2017; or, (2) at the latest, Plaintiffs had actual knowledge of the breach on October 23, 2013, when Hausknecht received an email from a Jay Silverman[8] stating that "there is a loan against the policy," which would terminate the statute of limitations in 2016 and also render Plaintiffs' present suit untimely. Defendant argues that the Plaintiffs have not demonstrated that the "fraud or concealment" exception applies, and their claims should thus be dismissed as untimely.

Plaintiffs counter that the exception does apply and thus sets the statute of limitations to October 2019—six years after Plaintiffs learned of the loan through the Jay Silverman email. Under this exception, Plaintiffs' suit would therefore be timely. In support of the applicability of

---

[8] It is not clear from the record or the Parties' briefs who Jay Silverman is, or what relationship he had with Plaintiffs.

this exception, Hausknecht says that for years, he tried to get information regarding the Policy from both Defendant and the Koresko-related entities (*e.g.*, by requesting quarterly policy statements) but was ignored by Defendant at the instruction of Penn-Mont. And, in 2013 he spoke directly to Koresko to "ask[] him what was going on."[9] He also maintains that he attempted to contact Defendant and Penn-Mont for a copy of his policy statement, but Defendant says that it has no record of this call.

There is some dispute as to whether Plaintiffs may have first learned of Koresko's then-alleged misdeeds some years before October 2013. Specifically, in 2009, he received a letter from the Department of Labor advising that the Department had filed a complaint against Koresko and his affiliates alleging that they had violated ERISA. The letter further stated that Hausknecht's "company sponsored a plan which was administered by" Penn-Mont. This letter, however, makes no mention of loans on insureds' life insurance policy. Indeed, these loans were not part of the Department of Labor's suit until November 2012, when it filed an amended complaint.

Defendant also argues that Plaintiffs had notice of their claims by February 2012, when Hausknecht read a news release by the Department of Labor pertaining to its lawsuit. The release stated that the suit pertained to the "alleged improper administration of death benefit plans marketed nationwide" and that "defendants allegedly underpaid benefits to participants, improperly withdrew more than $1 million in plan assets from the plans' trust." Hausknecht testified that he did not "underst[and] the implications of that statement" and understood it to mean that "they just didn't pay the full death benefit." Later in August of that year, however, he received a letter from Koresko which refuted these releases and represented that the Department

---

[9] The record does not indicate how, if at all, Koresko responded to Plaintiff's inquiry.

of Labor's suit was baseless: "we have" Koresko wrote "been in a dispute with the Department of Labor for quite some time" and expressed his view that the Department had taken the "unprecedented" position of "reject[ing] the law of the Third Circuit that an unvested welfare plan can be amended for any reason or no reason."

Given Koresko's actions to conceal his misdeeds, and Defendant's failure to inform Plaintiffs about the issuance of the Policy loan and respond to their inquiries for quarterly statements, Plaintiffs argue that the fraud or concealment exception applies, thus rendering their claims timely. Whether this defense thwarts Plaintiffs' Section 1132(a)(2) claim also requires a determination as to whether Defendant was an ERISA fiduciary under the CMCS Plan. That is because this exception tolls the statute of limitations for six years after "the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment" so long as there is "evidence that the defendant took affirmative steps to hide *its breach of fiduciary duty*." *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1552 (3d Cir. 1996) (emphasis added).

The language of the "fraud or concealment" exception and its interpretation by the Third Circuit make clear that it pertains to breaches by a *fiduciary* and actions taken by that fiduciary to conceal its misdeeds. *See id.*; *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 502 (3d Cir. 2001) ("The issue raised by this provision is . . . whether the *fiduciary* took steps to hide its breach so that the statute should not begin to run until the breach is discovered." (emphasis added)). If Defendant is a fiduciary, then the law is clear that the exception is triggered only if it took actions to conceal its missteps. *Id.*

In short, if Defendant is not found to be a fiduciary, then Plaintiffs' Section 1132(a)(2) claims necessarily must fail because claims under this Section can only be brought against an

ERISA fiduciary, thus mooting any need to discuss the question of statute of limitations.  If, however, Defendant is determined to be fiduciary, then the question of whether the "fraud or concealment" exception tolls the statute of limitations can be revisited.

### i.  Plaintiffs' Section 1132(a)(2) Claim

Congress enacted ERISA "to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years." *Boggs v. Boggs*, 520 U.S. 833, 839 (1997).  Crafted to bring order and accountability to a system of employee benefit plans plagued by mismanagement and abuse, *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989), ERISA is principally concerned with protecting the financial security of plan participants and beneficiaries.  29 U.S.C § 1001(b); *Boggs*, 520 U.S. at 845; *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983).  Because of this remedial purpose, ERISA "should be liberally construed in favor of protecting the participants in employee benefit plans." *See IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986).

A pertinent illustration of ERISA's broad construction is that the term "fiduciary" is defined "not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan . . . thus expanding the universe of persons subject to fiduciary duties—and to damages." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis in original) (internal citation omitted); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 413 (3d Cir. 2013) ("The definition of a fiduciary under ERISA is to be broadly construed.").  An entity is a fiduciary for purposes of ERISA if it is either named as such in the plan, or, as relevant here, if it exercises any "authority or control respecting management of the plan or the disposition of the plan's assets."  29 U.S.C. § 1002(21)(A); *Srein v. Frankford Tr. Co.*, 323 F.3d 214, 221 (3d Cir.

2003) (internal alterations omitted).

A party will be found to be a fiduciary for exercising authority or control if it exercised "*undirected* authority and control" over plan assets—meaning that it did not act at the direction of a person or entity authorized to give such direction. *Srein*, 323 F.3d at 221-22 (emphasis added). "[M]ere custody or possession over plan assets . . . without more" is not enough to give rise to fiduciary status. *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 347 (3d Cir. 2004). In determining whether an entity is a fiduciary, it is crucial to keep in mind that it "is not an all or nothing concept. . . .  [A] court must ask whether a person is a fiduciary with respect to the *particular activity* in question." *Srein*, 323 F.3d at 221 (emphasis added) (quoting *Maniace v. Com. Bank of Kansas City, N.A.*, 40 F.3d 264, 267 (8th Cir. 1994)). Thus, Defendant may be a fiduciary for one of the alleged acts of discretionary authority or control but lack fiduciary status for another. Plaintiffs theorize that Defendant exercised undirected authority over the Policy and was thereby a fiduciary in three instances which are discussed below.

### 1. The First Ownership Change from "REAL VEBA TRUST/FBO COMPLETE MEDICAL CARE OF NY P.C. WBP" to "REAL VEBA Trust"

Plaintiffs' first argument that Defendant had a fiduciary duty and breached that duty is premised on what it says was a change of ownership of the Policy in 2003 from "REAL VEBA Trust FBO Complete Medical Care of NY WBP" to "REAL VEBA Trust."  In other words, a deletion of the words "FBO Complete Medical Care of NY WBP" from the name of the Policy Owner.  It is undisputed that, in May 2003, Penn-Mont requested that Defendant delete "f/b/o the CMCS WBP" from the Policy ownership.  But the request was never fulfilled.  Rather than change the name, ManuLife requested that a completed Tax ID form be submitted to effectuate the change; this form was never provided and ManuLife did not change the ownership of the Policy.  Indeed, an internal ManuLife document dated July 9, 2004—one year after the request—

15

continued to list the owner of the Policy as "REAL VEBA TRUST . . . FBO COMPLETE

MEDICAL CARE OF NY P.C.WBP."  Therefore, to the extent that Plaintiffs' Section

1132(a)(2) claim is premised on this alleged first change in ownership, Defendant's Motion for

Summary Judgment shall be granted.

> **2.   The Second Ownership Change from "REAL VEBA
> TRUST/FBO COMPLETE MEDICAL CARE OF NY P.C.
> WBP" to "Complete Medical Care Service of NY, P.C. Welfare
> Plan Trust"**

It is not disputed by the Parties that in November 2005 the Defendant did in fact change

the owner and beneficiary of the Policy from "REAL VEBA TRUST/FBO COMPLETE

MEDICAL CARE OF NY P.C. WBP" to "Complete Medical Care Service of NY, P.C. Welfare

Plan Trust."  Plaintiffs argue that the change was an exercise of discretionary control or

authority, and that accordingly in making the change, Defendant was acting in a fiduciary

capacity.  Defendant maintains that it was not.  The schism between the Parties positions arises

from three disputes regarding two documents submitted to Defendant, a document referred to as

the "Second Verification" and the letter requesting the ownership be changed, which documents

Defendant considered in changing the beneficiary and owner of the Policy.

The first issue surrounds whether the "Second Verification" authorized Bonney to act on

CTC's behalf in interactions with Defendant.  At the time the second request was made, CTC

was the trustee for the REAL VEBA Trust and had the power to manage the Policy and act on

the trust's behalf.  *See, e.g.*, Restatement (Third) of Trusts § 70 (2007) (Am. L. Inst. 2007).  The

Second Verification listed Bonney as an authorized signatory for CTC, which Defendant

understood as meaning Bonney had the power to act on CTC's behalf.  Plaintiffs argue that the

Second Verification did not authorize Bonney to act for CTC in interactions with Defendant,

because the Second Verification was directed not to Defendant but to a third-party.  Defendant,

16

on the other hand, interprets the Second Verification as not directed to that third-party but as printed on that third-party's letterhead. [10]  Which Parties' understanding is correct is outcome determinative:  if Plaintiffs are correct that the Second Verification is intended for a third-party, then under the rules of agency Bonney was an appointed signatory only for her interactions with that third-party.  *See* Restatement (Second) of Agency § 37(1) (Am. L. Inst. 1958); *Callwood v. V.I. Nat'l Bank*, 221 F.2d 770, 777 (3d Cir. 1955) (relying upon the Restatement of Agency § 37(1) to narrowly construe a grant of power of attorney).  But because this dispute—was the document directed to a third party or sent on that third party's letterhead—is a dispute that cannot be resolved on the face of the document and the Parties have not pointed to any other evidence in the record that would sort out the question, the dispute is an issue reserved for the fact-finder and precludes summary judgment.  *See Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 n.10 (3d Cir. 1980) (stating that where, as here, a writing is ambiguous, it is "to be interpreted by the fact finder. . . ."). [11]

There are two other issues of fact relating to the letter request to change ownership itself which preclude summary judgment.  The first is that the request was made on Penn-Mont's letterhead, which Plaintiffs say had no authority to make the change.  Defendant counters that Penn-Mont had authority because the address of the trustee and owner of the Policy had been "c/o Penn-Mont" since the Policy's inception.  But the concern for Plaintiffs runs deeper than

---

[10] Defendant calls Plaintiffs' reading "nonsensical" asking "why would CTC (the trustee for the owner) provide a document to [Defendant] if it was not intended for [Defendant's] use and reliance?"  CTC is not a party, was not deposed, and thus has not explained why it might send a document directed to a third party to Defendant.

[11] Plaintiffs also contend that CTC's authorization of Bonney was invalid as a matter of law because the Restatement (Second) of Trusts forbids the kind of delegation of authority made in the Second Verification.  This argument does not compel entry of judgment in their favor because Plaintiffs have failed to present this argument "in a manner that permits the court to consider its merits" in that they have not offered any "development of [their] theory," "cite[d] relevant precedents" or otherwise "frame[d] the issues for decision."  *Dupree*, 617 F.3d at 728.

that; the change requested was purportedly on behalf of the REAL VEBA Trust, and not on behalf of the REAL VEBA Trust FBO CMCS WBP—the Policy owner.  Thus, Plaintiffs argue that the change request was made by a non-owner and was invalid.

These three issues present genuine issues of material fact—did the person requesting the change have the authority to make it, and if so, did they make the request on behalf of the correct entity?  Without answers to these questions in the record, summary judgment must be denied for both Parties on Plaintiffs' Section 1132(a)(2) claim to the extent that it is premised on the second ownership change.

### 3.   The Issuance of the Policy Loan

Plaintiffs' third theory of fiduciary responsibility arises from Defendant's issuance of the Policy loan in 2009.  Two requests for loans on the Hausknecht Policy were made.  At the time of both requests, the CMCS Plan Trust was listed as the Policy-owner, and its trustee was CTC. As trustee, CTC was empowered to act on behalf of the CMCS Plan Trust.  The terms of the Policy permitted the policy-owner to "get a loan by Written Request."  *See* Restatement (Second) of Agency § 37(1) (Am. L. Inst. 1958).

The first request, which listed the owner as the Single Employer Trust and CTC, was signed by Koresko who represented that he was "CTC Trustee Pres-Plan Admin. & Insured's Atty in Fact Signature and Authority Guaranteed."  Defendant balked and refused to issue the loan because the "incorrect name of the trust is listed."

The second request followed hard on the heels of the first request's denial.  It correctly listed the owner as the CMCS Plan Trust and was signed by Koresko as the "Director-Trustee" and the "Pres-Plan Admin. & Insured Atty in Fact."  In support of the second application, Koresko provided to Defendant an Employee Participation Agreement, purportedly for the

purpose of showing that he was authorized to sign on behalf of the CMCS Plan Trust. Defendant, however, again rejected the loan application because the attached Employee Participation Agreement "only show[s] that John Koresko is the [power of attorney] for the employee" not the CMCS Plan Trust or CTC. [12]

Undeterred, Koresko submitted a package of documents—an affidavit, a letter, a custodial agreement and two trust documents—to support the Policy loan application. None of the documents refer to the CMCS Plan Trust, although they do refer to the REAL VEBA and Single Employer Trust. The letter and the affidavit represented that CTC had merged with F&M, and that F&M had subsequently been removed and replaced by PPT—a company owned by Koresko. Koresko was represented to be the director of PPT and having the authority to sign on behalf of "the Trust." Based on these submissions, Defendant determined Koresko was authorized to request the loan, made the loan and issued $405,892.44 to Penn-Mont.

It is undisputed that in late 2005, the listed owner had been changed to the CMCS Plan Trust. Plaintiff argues that because the documents Koresko submitted to Defendant in support of the second loan application pertained to the REAL VEBA and Single Employer Trusts—not the CMCS Plan Trust—they did not establish Koresko was authorized to take a loan on the Policy. Thus, they conclude that Defendant's issuance of the loan amounted to undirected control over the Policy. On the other hand, Defendant argues that because the ownership change request which led to CMCS Plan Trust's ownership stated that the CMCS Plan Trust was "part of the

---

[12] The Employee Participation Agreement appointed PennMont and John Koresko, as well as their agents, employees, and delegates, as Hausknecht's "Limited Attorney in Fact a power of attorney with respect to *all* matters connected with and/or related to the procurement and maintenance of benefits payable to [Hausknecht] pursuant to REAL VEBA and the Employer's Welfare Benefit Plan." The Agreement further empowered Koresko and his affiliates to "execute any and all documents on behalf of [Hausknecht], including applications for insurance coverage . . . or any other document considered by the plan administrator, in its sole and absolute discretion, to be incident to the administration or operation of the plan." As Defendant pointed out, it did *not* appoint Koresko and his affiliates as a limited attorney in fact for CMCS, the CMCS Plan, or the CMCS Plan Trust.

SINGLE EMPLOYER TRUST," the supporting documents *do* demonstrate that Koresko was authorized to take out a loan on the Policy.  As this issue is unresolved, it is not possible to determine whether the issuance of the loan was an exercise of undirected control over the Policy. This is a classic issue of disputed material fact which precludes summary judgment.[13]

### ii. Plaintiffs' Section 1132(a)(3) Claim

Both Parties have filed competing Motions for Summary Judgment on Plaintiffs' alternate theory of liability under ERISA, brought under Section 1132(a)(3).  This provision authorizes a "participant, beneficiary or fiduciary of a plan to bring a civil action" against any person "to obtain appropriate equitable relief to redress violations of ERISA Title I."  *Harris Tr. and Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000) (internal citations and quotation marks omitted) ["*Harris Trust*"].  Section 1132(a)(3) has been interpreted to be a "catchall" provision which "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy."  *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (internal quotation marks omitted).

Defendant argues that Plaintiffs claim fails on procedural grounds because it is untimely, and on substantive grounds because they have not demonstrated that Defendant knew of Koresko's fiduciary breaches—an element that must be met before liability can be found under Section 1132(a)(3).  Neither argument is persuasive.

Turning first to the procedural: as previously noted, Plaintiffs argue that their claims are timely under ERISA's "fraud or concealment" exception, which tolls the statute of limitations for

---

[13] Given that the record is inconclusive as to whether Defendant was a fiduciary with respect to the second change in ownership or the issuance of the Policy, it is also not possible to grant summary judgment on Defendant's counterclaim for breach of the Hold Harmless Agreement.  As explained *supra*, if Defendant was a fiduciary in either of these actions, ERISA would operate to invalidate the Hold Harmless Agreement. *See* 29 U.S.C. § 1110(a) (invalidating "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation or duty.").

six years after the "the plaintiff in the exercise of reasonable diligence discovered or should have

discovered the alleged fraud or concealment" so long as there is "evidence that the defendant

took affirmative steps to hide *its breach of fiduciary duty*." *Kurz*, 96 F.3d at 1552 (emphasis

added). The language of the "fraud or concealment" exception and its interpretation by the Third

Circuit make clear that it pertains to breaches by a *fiduciary* and actions taken by that fiduciary

to conceal its misdeeds. *See id.* However, as explained by the Honorable Magistrate Judge

Lloret in *Spear v. Fenkell*, whether the "fraud or concealment" exception applies to a non-

fiduciary who is implicated in a fiduciary's wrongdoing under Section 1132(a)(3) presents a

"materially different question" that has not been answered by the Third Circuit. 2016 WL

7475814, at *5 (E.D. Pa. Dec. 29, 2016) (Lloret, M.J.).

 Neither Party's briefs grapples with the distinction raised in *Spear*, or explains how the

fraud or concealment exception should be applied to Plaintiffs' Section 1132(a)(3) claim. In

making an argument, a party must "offer some argument or development of its theory", "cite

relevant precedents" and "frame the issues for decision." *Dupree*, 617 F.3d at 728 (internal

citation and quotation marks omitted). This Court's role is not to craft arguments for the parties,

especially those represented by counsel. *See Aliaj v. Atty Gen.*, 387 F. App'x 136, 138 (3d Cir.

2010). As Defendant did not argue this defense "in a manner that permits the court to consider

its merits," it has failed to demonstrate that Plaintiffs' Section 1132(a)(3) claim is time-barred.

*Dupree*, 617 F.3d at 728.

 Turning to the substance of Plaintiffs' Section 1132(a)(3) claim, this Section requires two

key elements to be met before liability is imposed on a non-fiduciary. First, there must be a plan

fiduciary who had "actual or constructive knowledge of the facts satisfying the elements of a

[prohibited] transaction, [and] caused the plan to engage in the [unlawful] transaction" and,

second, the non-fiduciary must have "had actual or constructive knowledge of the circumstances that rendered the [fiduciary's] transaction unlawful." *Harris Trust*, 530 U.S. at 251 (emphasis added). In sum, there must be two actors, a fiduciary and a non-fiduciary, the latter of whom had constructive knowledge of the circumstances rendering the transaction unlawful before the non-fiduciary can be held liable under Section 1132(a)(3). In the instant case, Plaintiffs posit that Defendant is liable under Section 1132(a)(3) because Koresko and his affiliates were fiduciaries who engaged in a prohibited transaction,[14] to wit, the loan on the Hausknecht Policy was a prohibited transaction under Section 406(a) of ERISA, 29 U.S.C. § 1106(a), and that Defendant had constructive knowledge of the circumstances which made the loan unlawful.

Constructive knowledge has been interpreted to mean that the non-fiduciary "*should have known* of the existence of the trust and the circumstances that rendered the [action] in breach of the trust." *Harris Trust*, 530 U.S. at 251; Restatement (Second) of Trusts § 297(a) (Am. L. Inst. 1959) (defining notice as when a person "knows or should know of the breach of trust."). In commentary, the Restatement further clarifies that a non-fiduciary should have known of the breach "when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust." Restatement (Second) of Trusts § 297 cmt. a (Am. L. Inst. 1959).

The commentary to the Restatement of Trusts has been used to inform the meaning of constructive knowledge under Section 1132(a)(3) of ERISA, *see Harris Trust*, 530 U.S. at 251-

---

[14] Specifically, Plaintiffs contend that the loan was a prohibited transaction under Section 406(a) of ERISA, 29 U.S.C. § 1106(a).

52, such that a defendant "who is on notice that conduct violates a fiduciary duty is chargeable with constructive knowledge of the breach if reasonably diligent investigation would have revealed the breach." *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 283 (2d Cir. 1992) (citing Restatement (Second) of Trusts § 297 cmt. a (Am. L. Inst. 1959)), *abrogated on other grounds by Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 322-23 (2d Cir. 2003). If questions arise concerning an actor, like Koresko's, authority to act on the part of the trust, so too arises an obligation on the part of a defendant to determine whether that actor is so authorized to act. *Id.* (citing *Whitney v. Citibank*, 782 F.2d 1106, 1116 (2d Cir. 1986)); *Corman v. Nationwide Life Ins. Co.*, 396 F. Supp.3d 530, 543 (E.D. Pa. 2019). And if reasonably diligent investigation would have revealed that said actor did not have authorization to act, then the defendant can be charged with constructive notice of the circumstances of the breach. *Diduck*, 974 F.2d at 283.

Under this standard, there are genuine issues of material fact as to whether Defendant had constructive knowledge of the circumstances which made the loan on the Hausknecht Policy a prohibited transaction under ERISA. As Plaintiff points out, there were inconsistencies in the loan requests and the supporting documentation as to the trust which owned the Policy, its trustee, and whether the documentation provided showed that Koresko was authorized to act on behalf of either. The record does show that Defendant undertook some inquiry to determine whether Koresko was authorized to request the policy loan as it twice denied his request. But still, it is not apparent why the additional package of documents convinced Defendant that Koresko was authorized to do so, and whether it undertook a "reasonably diligent investigation" when making that determination. For example, Defendant denied Koresko's first policy loan requests on grounds that the trust listed on the loan request, the Single Employer Trust, was incorrect. And yet, the documentation supporting the second loan request and which Defendant

deemed sufficient again pertained only to the Single Employer Trust.  Why was reference to the Single Employer Trust insufficient in the first inquiry, but sufficient in the next?  The answer cannot be discerned from the summary judgment record, and it is therefore likely that "resolution of the issue will hinge, to a significant extent, on the credibility of witnesses at trial."  *Spear*, 2016 WL 5661720, at *31.  The Parties' cross-motions for summary judgment on Plaintiffs' Section 1132(a)(3) claim shall therefore be denied.

### c.  The RICO claims

Plaintiffs raise three RICO claims, brought pursuant to Section 1962(c) and Section 1962(d).  None of Plaintiffs' claims survives summary judgment because there is nothing which suggests Defendant engaged in or knew of a "pattern of racketeering activity"—a necessary element for liability under both Sections 1962(c) and 1962(d).

Two of the claims fall under Section 1962(c) of RICO, one alleging direct liability and the other alleging vicarious liability for Koreskos actions.  18 U.S.C. § 1962(c).  Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."   To maintain a claim for liability under Section 1962(c), Plaintiffs must demonstrate "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010).

Plaintiffs' third RICO claim is for conspiracy under RICO Section 1962(d), which provides for liability if a defendant shares a common purpose with his co-conspirators and "knowingly agree[s] to facilitate a scheme, which includes the operation or management of a RICO enterprise."  *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001).  To succeed on such a claim,

24

a plaintiff must establish that the defendant had "knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate § 1962(a), (b), or (c)."  *Odesser v. Cont'l Bank*, 676 F. Supp. 1305, 1312 (E.D. Pa. 1987) (citation omitted); *Smith*, 247 F.3d at 537 n.11 (holding that those who "merely provide services" cannot be held liable under Section 1962(d); "liability will arise only from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity.").  Accordingly, as with a Section 1962(c) RICO claim, a claim under Section 1962(d) requires the plaintiff to "show that defendants agreed to the commission of a 'pattern of racketeering.'"  *Breslin v. Brainard*, 2003 WL 22351297, at *13 (E.D. Pa. Oct. 14, 2003), *aff'd* 128 F. App'x 237 (3d Cir. 2005).

To constitute "racketeering activity," an act must "in itself [be] subject to criminal sanction" in that it would be "chargeable or indictable" or constitute an "offense[]that [is] punishable[] under various criminal statutes."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 488 (1985) (internal citation, quotation marks and alteration omitted).  And to constitute a "*pattern* of racketeering activity," the would-be racketeer must have committed at least two related predicate acts within ten years of each other.  18 U.S.C. § 1961(5)(emphasis added); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-39 (1989).

Plaintiffs raise a slew of acts which they contend constitute predicate acts under RICO, including, the payment of commissions to Lawrence Koresko for sales of insurance policies as an unlawful offer to influence the operation of an employee benefit plan in violation of 18 U.S.C. § 1954; the issuance of the unauthorized loan on the Hausknecht Policy and "at least four [other] loans" as a theft or embezzlement of plan funds in violation of 18 U.S.C. § 664; and, "at least 50 instances" in which Defendant purportedly faxed its customers "Koresko's fraudulent marketing

materials" which Plaintiffs claim constituted mail or wire fraud.[15]

The problem with some of these alleged predicate acts—namely, the 50 faxes of marketing materials and the four other policy loans—is while they are referenced in their brief in opposition to Defendant's Motion, Plaintiffs have failed in their obligation to support these allegations with citations to "particular parts of materials in the record. . . ." Fed. R. Civ. P. 56(c)(1)(A); Policies and Procedures of the Honorable Wendy Beetlestone (July 2022), https://www.paed.uscourts.gov/documents/procedures/beepol.pdf (requiring Parties to make "specific citations to the joint appendix" in support of their positions as summary judgment.). The problem is not just a procedural faux pas; the Court's own scan of the Parties' 2,000 page record was unsuccessful in uncovering a single document that provides factual support for these alleged predicate acts.  Allegations alone are not enough at summary judgment.  *See Celotex Corp.*, 477 U.S. at 324 (requiring the non-moving party to "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'").

With respect to the remaining predicate acts, namely, the loan on the Hausknecht Policy and the payment of industry-standard broker commissions to Lawrence Koresko, Plaintiffs have failed to explain why these acts are "chargeable" or "indictable" offenses.  With respect to the payment of commissions, Plaintiffs contend paying a commission to influence an employee of a welfare benefit plan, Lawrence Koresko, is a violation of 18 U.S.C § 1954.  The problem with this theory is that the evidence in the record shows that Defendant did not pay the commissions to Lawrence Koresko; rather, the commissions were first paid to an insurance brokerage, which brokerage would then pay Lawrence Koresko who would then assign the commission to Penn-

---

[15] In their opposition to Defendant's Motion for Summary Judgment, Plaintiffs also state that the collection of interest on the unauthorized loans is a predicate offense but make no argument as to why the collection of interest is "chargeable" or "indictable."  This argument, premised on no more than "conclusory assertion[s]," is therefore deemed waived. *See Reynolds*, 128 F.3d at 178.

Mont pursuant to a verbal agreement he had with his brother.  Lawrence Koresko testified that the insurance companies were not aware of this payment chain and nothing in the record suggests that Defendant knew that the commissions made their way to Penn-Mont.  Without anything to suggest that the commissions were knowingly paid to Penn-Mont with an "intent to influence[] . . . the actions, decisions or other duties" involving a welfare benefit plan, these commissions paid "in consideration for [an insurance company's] agent's sale of an insurance policy to an ERISA plan [are] not [] criminal act[s]. . . ."  *Sante Min. Waters, Inc. v. Schotz*, 1991 U.S. Dist. LEXIS 11347, at *6 (N.D. Cal. May 29, 1991).

Plaintiffs' remaining theory posits that the Hausknecht loan is indictable under 18 U.S.C. § 664, which prohibits the embezzlement of plan funds.  Even assuming *arguendo* that it is, a single loan does not a pattern of racketeering activity make.  18 U.S.C. § 1961(5).

Plaintiffs' theory of vicarious liability under Section 1962(c), which is premised on an argument that the Koreskos and Koresko Financial were Defendant's agents when selling their insurance products, fares no better.  Even assuming that they were agents—which the Parties dispute—the agency relationship would extend only to the sales of insurance policies.  *See, e.g.*, Restatement (Second) of Agency § 33 (Am. L. Inst. 1958).  The sales of insurance products, without more, cannot constitute "chargeable" or "indictable" offenses; a ruling which held otherwise would hold the entire insurance industry as unlawful.  Since there is no evidence which raises a genuine dispute of fact as to whether Defendant or its purported agents engaged in a pattern of racketeering activity, Defendant's Motion for summary judgment on Plaintiffs' RICO Section 1962(c) claims shall be granted.

Plaintiffs' RICO Section 1962(d) claim likewise does not survive because there is no evidence which shows that Defendant had knowledge that the Koreskos engaged in a pattern of

racketeering activity.  Plaintiffs only argument is that Defendant had constructive knowledge that the loan on the Hausknecht Policy was unauthorized under Section 1332(a)(3) suffices to establish knowledge under this provision of RICO.  But again, this loan constituted a single act, so even if Defendant should have known of its unlawfulness, nothing suggests it otherwise knew of a "pattern" of racketeering activity.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion shall be granted with respect to Plaintiffs' RICO claims and granted with respect to Plaintiffs' Section 1132(a)(2) ERISA claim premised on the first change of ownership.  The Parties' cross-motions shall be denied in all other respects.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**